**OKC CORP., Petitioner,**

v.

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 705–70.**

United States Court of Appeals,
Tenth Circuit.

Feb. 14, 1972.

Robert G. Sugarman, New York City (Sullivan & Cromwell, John F. Arning, New York City and Charles P. Russ, III, of counsel, on the brief), for petitioner.

Montgomery K. Hyun, Washington, D. C. (Joseph Martin, Jr., Gen. Counsel, Harold D. Rhynedance, Jr., Asst. Gen. Counsel, and Frederick H. Mayer and Thomas F. Howder, Washington, D. C., on the brief), for respondent.

Before LEWIS, PHILLIPS and Mc-WILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

The issue here to be determined is whether there is substantial evidence to support a final order of the Federal Trade Commission finding a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and directing the acquiring corporation to *totally* divest itself of the stock of the acquired corporation, the Commission deeming total divestiture essential to a restoration of competition in the relevant cement and ready-mix concrete industries in the New Orleans metropolitan area. Our study of the record leads us to conclude that there is such supporting evidence and we therefore affirm the Commission's order.

OKC Corp., formerly the Oklahoma Cement Company and hereinafter referred to as OKC, has its headquarters in Dallas, Texas, and prior to the acquisition in question was principally engaged in the manufacture and sale of portland cement, asphalt, automotive gasoline, fuel oil and various other petroleum products. OKC operates two cement manufacturing plants, one in Pryor, Oklahoma, having an annual capacity of two million barrels, and the other in New Orleans, Louisiana, with a 1.7 million barrel annual capacity. Since it completed its New Orleans plant in 1964, OKC has become the third largest supplier of portland cement in the New Orleans area. In 1968 this plant shipped 966,916 barrels valued at $3.77 million within the New Orleans area, which accounted for 23 per cent of the total shipments of portland cement made into the area. OKC's principal custom-

ers for its portland cement are ready-mix firms, oil well servicing companies, public works projects and oil field pipe-coating companies, with ready-mix firms being the largest purchasers of portland cement.

Jahncke Service, Incorporated, hereinafter referred to as Jahncke, is a conglomerate based in New Orleans which engages in various and distinct enterprises, including marine hydraulic dredging of rivers and harbors, the dredging and sale of marine shell and the production and sale of ready-mix concrete. Jahncke has been a well-recognized, highly successful, and independent business enterprise in New Orleans for nearly 100 years and has engaged in the ready-mix business for the past 30 years. Prior to its acquisition by OKC, Jahncke operated as an integrated business unit under a single centralized management, with two principal operating departments (hydraulic dredging and building materials) which were more or less organized along functional and product lines. During 1965–68, sales of merchandise by the building material department, including ready-mix sales, accounted for about 60 per cent of Jahncke's total revenues. Revenues from dredging operations, short-line railroad operations, joint venture construction projects and other sources constituted the remaining 40 per cent.

During 1968 and 1969, OKC acquired a majority stock interest in Jahncke and for practical purposes assumed control of that company. It was this stock acquisition which precipitated the filing of a formal complaint with the Commission charging OKC with a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, such acquisition allegedly tending to lessen competition and create a monopoly in the production and sale of portland cement, ready-mixed concrete, shells and construction aggregates in the New Orleans area. Hearings were later held before an examiner who in due time issued an initial decision in which he found,

among other things, that OKC's acquisition of the stock of Jahncke violated Section 7 of the Clayton Act in that the acquisition did tend to substantially lessen competition in the sale of cement and concrete in the New Orleans area and the examiner ordered OKC to divest itself of Jahncke's ready-mix concrete business.

On cross-appeals, the Commission adopted the examiner's findings with respect to the portland cement and ready-mix concrete product markets and the New Orleans geographic area, as well as his conclusion that OKC's acquisition of the stock of Jahncke violated Section 7 of the Clayton Act. But contrary to the examiner's divestiture order, the Commission concluded that the entire Jahncke enterprise, not simply the ready-mix portion, should be divested as a unit in order to insure that the ready-mix business of Jahncke would survive as a viable, independent, local competitive entity and that there be a restoration of competition in the relevant cement and ready-mix industries in the New Orleans metropolitan area. Accordingly, the Commission ordered a divestiture of all Jahncke stock held by OKC within six months after its order becomes final.

OKC has now filed with this court a petition for review wherein it does not challenge the finding of an antitrust violation, but limits its petition to the question of the propriety of the Commission's order that there be a total—as opposed to a partial—divestiture.

In ordering OKC to totally divest itself of its stockholdings in Jahncke, the Commission found that there was an "insufficient basis" for the examiner's conclusion that the ready-mix business of Jahncke, "if severed from the entire enterprise, could survive as a viable, independent competitive entity." As concerns the nature of the remedy, i. e., total divestiture as opposed to partial divestiture, the Commission summarized as follows:

"In sum, we are convinced that competition would suffer from the elimi-

nation of Jahncke as an independent ready-mix producer in the New Orleans market. We know from the long history of this organization that it is capable of maintaining its independence in the ready-mix line if it remains unchanged. On the other hand, we are far from persuaded that this would be true if the ready-mix business would be severed from the remainder of the enterprise. Consequently, we cannot agree with the hearing examiner that the market structure would be adequately restored by divestiture of only the ready-mix unit. The holding that partial divestiture would afford complete relief is at best conjectural. It is therefore rejected."

Both parties agree that the ultimate issue is whether the record contains "substantial evidence" to support the order of the Commission directing total divestiture. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951). The Commission argues that the record contains such supporting evidence; whereas, OKC's position is that it is the examiner's order, and not that of the Commission, that finds substantial support in the record. Before considering the evidence bearing on the issue of total versus partial divestiture, we would first consider the effect on our decisional process of the fact that the examiner and the Commission differed in their respective conclusions as to the proper remedy for the particular antitrust violation here in question.

█ In making our determination as to the sufficiency of the evidence, we are to consider the record as a whole, including the findings and conclusions of the examiner. 5 U.S.C. § 706 and Universal Camera, *supra*. However, the findings and conclusions of the examiner are not sacrosanct and are not necessarily binding either on the Commission or us. They represent but a part of the entire record to be considered by us on review. United States Retail Credit Association, Inc. v. F.T.C., 300 F.2d 212 (4th Cir. 1962). In American Fed. of Television & Radio Artists v. NLRB, 129 U.S.App.D.C. 399, 395 F.2d 622 (1968) substantial evidence was found to support the administrative agency's findings even though the case was close on the facts and even though there was perhaps substantial evidence to support the examiner's contrary finding on the issue there in question. *See also* K. Davis, Administrative Law § 10.04 (Supp.1970) for a discussion of the weight to be given an examiner's report by a reviewing court. And so, where the Commission and the examiner be in disagreement, the examiner's findings on review should be considered and given such weight as in reason and in the light of judicial experience they merit. However, even though the Commission and the examiner be in disagreement, the " 'substantial evidence' standard is not modified in any way * * *." Universal Camera, *supra*.

*Universal Camera* also held that the "significance of his [the examiner's] report, of course, depends largely on the importance of credibility in the particular case." In our view, the instant case is essentially one where the examiner and the Commission simply drew different conclusions from the same evidence as to the viability of Jahncke's ready-mix business if it were to be cut adrift from the conglomerate. In this regard the examiner concluded that the ready-mix business could stand on its own two feet; whereas, the Commission found, as above indicated, an insufficient basis for concluding that the ready-mix unit of Jahncke, if severed from the entire enterprise, could survive as a viable, independent competitive entity.

█ This conclusion of the Commission in our view does find substantial support in the record. The evidence on this matter as might be expected was in some degree of conflict. Needless to say, conflicting inferences could with propriety be drawn from that evidence which was not in dispute. The fact of the matter is that the ready-mix operation of Jahncke had been operating at a

loss for some time both before and after OKC acquired Jahncke's stock. Certain witnesses did express an *opinion* that assuming certain changed circumstances Jahncke's ready-mix business could be turned into a profitable operation. This opinion was controverted by other opinion testimony to the effect that the ready-mix business could not stand alone. Indeed, an officer of OKC testified that Jahncke's ready-mix business had been losing money and, being an uneconomical business, OKC desired to divest itself of the ready-mix operations, though OKC at the same time wanted to keep the other Jahncke enterprises which operated at a profit. There was other testimony that historically the financial resources of the entire Jahncke company had been of aid to the ready-mix operation. Without going into further detail, it is sufficient to say that our study of the record, including the examiner's initial decision, leads us to conclude that there is substantial evidence to support the Commission's order.

■ Total divestiture is not necessarily inappropriate even though the antitrust violation found relates to but one aspect of the company thus acquired, especially where, as here, total divestiture is deemed necessary to restore effective competition. In a somewhat analogous situation, the United States Supreme Court in United States v. Du Pont & Co., 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed. 2d 318 (1961), ordered total divestiture, and in so doing observed as follows:

> "It cannot be gainsaid that complete divestiture is peculiarly appropriate in cases of stock acquisitions which violate § 7. That statute is specific and 'narrowly directed,' Standard Oil Co. v. United States, 337 U.S. 293, 312, [69 S.Ct. 1051, 93 L.Ed. 1371] (1949), and it outlaws a particular form of economic control—stock acquisitions which tend to create a monopoly of any line of commerce. The very words of § 7 suggest that an undoing of the acquisition is a natural remedy. Divestiture of dissolution has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control, and it is reasonable to think immediately of the same remedy when § 7 of the Clayton Act, which particularizes the Sherman Act standard of illegality, is involved. Of the very few litigated § 7 cases which have been reported, most decreed divestiture as a matter of course. Divestiture has been called the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found."

Order affirmed.