FEDERAL TRADE COMMISSION,
Petitioner,

v.

PepsiCo, INC., Respondent.
No. 803, Docket 73–1381.

United States Court of Appeals,
Second Circuit.

Argued March 13, 1973.

Decided April 3, 1973.

Gerald Harwood, Atty., Washington, D. C. (James T. Halverson, Acting Gen. Counsel, Harold D. Rhynedance, Jr., Asst. Gen. Counsel, Vincent Tricarico, Atty., F. T. C., Washington, D. C., of counsel), for petitioner.

Edward F. Howrey, Washington, D. C. (Howrey, Simon, Baker & Murchison, Washington, D. C., Mudge, Rose, Guthrie, Alexander & Mitchell, New York City, John J. Kirby, Jr., Milton Black, James G. Frangos, Thomas R. Esposito, New York City, Richard T. Colman and G. Joseph King, Washington, D. C., of counsel), for respondent.

Before HAYS, MULLIGAN and OAKES, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an original action by the Federal Trade Commission (Commission) for a preliminary injunction and other relief pursuant to the All Writs Act (28 U.S.C. § 1651(a)). The Supreme Court has held in FTC v. Dean Foods Co., 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966), that the Courts of Appeals have jurisdiction to issue preliminary injunctions to prevent the consummation of mergers upon a showing that effective remedial orders would otherwise be virtually impossible, thus rendering a final divestiture decree after a Commission determination, futile. The stated purpose of the petition here is to preserve the *status quo pendente lite* of Rheingold Corporation (Rheingold) in aid of this Court's jurisdiction under Section 11(c) of the Clayton Act (15 U.S.C. § 21(c)) and Section 5(c) of the Federal Trade Commission Act (15 U.S.C. § 45(c)), to review final orders of the Federal Trade Commission. The Commission urges that the acquisition by PepsiCo, Inc. (PepsiCo) of 83% of the stock of Rheingold will eventually be determined to violate Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act. The Commission further takes the position that its ability to enter an effective order will "probably" be gravely impaired unless Rheingold's separate existence is maintained and the independence of its present management preserved.

I

PepsiCo is primarily engaged in the manufacture and distribution of beverage concentrates and syrups and the production and distribution of soft drinks (soft drink business). PepsiCo is a diversified company and is engaged in other services and sales not here pertinent. The soft drink business of PepsiCo essentially consists of manufacturing soft drink concentrates, bottled either by PepsiCo or its franchised independent bottlers. Its products are merchandised under the trade names Pepsi-Cola, Diet Pepsi-Cola, Patio, Teem and Mountain Dew. In 1971, PepsiCo had *net sales of $1.3 billion* and a net income after taxes of about $63 million. In that year it was the second largest seller of soft drink concentrates nationwide, occupying 16.3% of the market. The Coca Cola Company heads the soft drink industry with an estimated 42% share of the market in 1971.

Rheingold is primarily engaged in the manufacture and distribution of beer which accounts for about 70% of its sales. It also manufactures and distributes soft drink concentrates and syrup

and produces and merchandises soft drinks. Its soft drink business constitutes about 30% of its sales but accounts for 75% of its profits. Rheingold is a franchised independent bottler for PepsiCo in southern California, Puerto Rico, Mexico, and Florida. In 1971 Rheingold had net sales of about $230 million, making a net profit after taxes of about $4 million. Rheingold acquired the Grapette Company, a soft drink concentrate manufacturer, in August, 1970, changing its name to Flavette. Flavette then purchased two small soft drink companies, Dr. Wells and Mason & Mason. Flavette, excluding Mason & Mason's root beer, also utilized independent franchised bottlers and serves a geographic area containing some 50 million people. Since 1970 Flavette has franchised some 81 independent bottlers.

The soft drink concentrate business is presently highly concentrated and growing, with total sales increasing from $353 million in 1967 to $450 million in 1971. Coca Cola and PepsiCo combined to control some 58.3% of the business. The top four companies in 1971, account for 70.6% of the industry. The Federal Trade Commission takes the position that the soft drink business is not easily entered. Soft drinks are made from concentrates which are typically sold and distributed by franchised bottlers who are responsible for the promotion of the business in the franchised territory and who normally own the facilities for bottling and canning the concentrate. New entrants face the barrier of competing against well-established brands which are prolifically advertised. It is estimated that an annual expenditure of $50 million for advertising expenses over a 5 to 8 year period is necessary to establish a new product on a nationwide scale. The Commission also argues that obtaining adequate bottling and canning facilities plus the acquisition of technical know-how present barriers for prospective entrants into the business.

PepsiCo first published its offer to purchase 1,600,000 shares of common stock of Rheingold on October 25, 1972. This offer was later amended to purchase all shares in excess of 1,600,000 if they were tendered before the close of business on November 16, 1972. On November 15, the Federal Trade Commission commenced complaint proceedings, urging that the acquisition violated Section 7 of the Clayton Act (15 U.S.C. § 18) [1] as well as Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45).[2] The Commission did not seek at this point to enjoin the tender offer. PepsiCo and the Commission then entered into the negotiation of a hold-separate agreement. The Commission agreed in the interim not to file any action requiring PepsiCo to hold Rheingold assets separate until December 4, 1972 and PepsiCo agreed not to assume or exercise actual control over Rheingold if its tender offer proved successful. The offer was successful and PepsiCo now owns 83% of the shares of Rheingold which it acquired for a cash investment of some $57 million. On December 1, 1972, the Commission withdrew its complaint for the purpose of entering into a consent order. PepsiCo made an offer on January 15, 1973 subsequently modified on January 30, 1973, but the proposal was rejected by a 3–2 vote of the Commission. The matter was returned to the adjudicatory process on

1. Section 7, 15 U.S.C. § 18 provides in relevant part:

    No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

2. Section 5(a)(1), 15 U.S.C. § 45(a)(1) provides:

    Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

February 7, 1973 and PepsiCo notified the Commission on March 2, 1973 that it was terminating the hold-separate agreement of November 16, 1972.

## II

As a result of the 5–4 holding of the Supreme Court in FTC v. Dean Foods Co., *supra,* we are placed in the unenviable position of predicting whether there has been a violation of the antitrust laws involved without the benefit of any agency determination or a record which would provide the detailed economic and corporate data normally available in comparable litigation. It is established, however, that the first test which we must apply is whether or not the Commission has established a "reasonable probability" that the respondent is in violation of the statute. FTC v. OKC Corp., 1970 CCH Trade Cas. ¶ 73,288 (5th Cir., July 8, 1970); see United States v. Ingersoll-Rand Co., 320 F.2d 509, 523–524 (3d Cir. 1963); United States v. IT&T, 306 F.Supp. 766, 774 (D.Conn.1969), appeal dismissed, 404 U. S. 801, 92 S.Ct. 20, 30 L.Ed.2d 34 (1971); United States v. Atlantic Richfield Co., 297 F.Supp. 1061, 1067 (S.D. N.Y.1969); cf. Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

In our view, the Federal Trade Commission has sustained its burden with respect to this aspect of the case. This is basically a horizontal merger [3] since PepsiCo in acquiring Rheingold has purchased a subsidiary (Flavette) competing with PepsiCo in the soft drink business. Flavette's share of the national soft drink non-cola market is about 1% and about .3% if cola drinks are included.[4] Anti-trust concern here is prompted by the undoubted fact that PepsiCo stands Number 2 in the national soft drink market where four companies control 70.6% of the business. The Supreme Court in a series of cases, United States v. Continental Can Co., 378 U.S. 441, 461–462, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Aluminum Co. of America, 377 U.S. 271, 279, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 365 n. 42, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), and our own Court recently in Stanley Works v. FTC, 469 F.2d 498, 507–508 (1972), have held that even slight aggregations are viewed with suspicion in a highly concentrated market.[5] In *Stanley Works,* four leading companies dominated only 50% of the market. The acquisition by a company, which controlled 1% of the market, of a competitor with

---

3. Since Rheingold is also a franchised bottler of PepsiCo there are vertical dimensions here as well. PepsiCo states that pursuant to a 1968 consent order negotiated with the Commission, Docket No. 8606, PepsiCo is permitted to purchase its own franchised bottlers even though they are engaged in the concentrate business. In view of our disposition of this matter, the point is not material.

4. At this stage of the proceedings there is no indication of any particular geographic market (section of the country) in which PepsiCo and Rheingold through Flavette are actually competing. Moreover, the "line of commerce" or product market may eventually be narrowed in litigation. The complaint of the FTC in its definitional paragraph defines soft drinks and concentrates to include all non-alcoholic carbonated beverages. Whether cola drinks are sufficiently non-interchangeable in terms of price, quality and use so as to constitute a separate relevant product market, is a question which has not been determined or even briefed, yet both parties make reference to a non-cola market. On the basis of the complaint, we can only assume that the geographic market is nationwide, that the product market is all carbonated soft drinks and that Flavette's share is .3%.

5. We are not unaware that the Merger Guidelines of the United States Department of Justice define a highly concentrated market as one in which the shares of the four largest firms amount to approximately 75% or more. However, this action has been initiated by the Federal Trade Commission, not the Department of Justice. It is further noted that the top four companies which controlled 66.3% of the business in 1965 controlled 70.6% of the industry in 1971.

a market share of 22 to 24% was found to be in violation of Section 7 of the Clayton Act and not *de minimis*.

There are two other factors which weigh the balance here in the Commission's favor. The number of bottlers has steadily declined from 5,400 in 1948 to 2,300 in 1971 as the result of combinations. Moreover between 1958 and 1972 PepsiCo has acquired ten bottlers which were previously its independent franchisees.

We have examined the opinions of the Supreme Court since the 1950 amendment to Section 7 of the Clayton Act and recall as a practical consideration Mr. Justice Stewart's comment in his dissenting opinion in United States v. Von's Grocery Co., 384 U.S. 270, 301, 86 S.Ct. 1478, 1495, 16 L.Ed.2d 555 (1966): "The sole consistency that I can find [in the Supreme Court cases] is that in litigation under § 7, the Government always wins." We appreciate that the Commission here need not establish any actual anti-competitive effects but only an incipiency. The reasonable probability of establishing probable as distinguished from actual competitive injury, is in our view predictable here in light of the concentration of the industry and the difficulty of new entry which requires bottling facilities and huge advertising outlays.[6]

### III

The Commission seeks a preliminary injunction which will effectively prevent PepsiCo from exercising and assuming control over Rheingold until the issuance of a final order in the administrative proceeding. The exercise of this control, in the view of the Commission, is incompatible with the preservation of Rheingold as an entity having the capabilities and resources for becoming an important competitor through Flavette in the production and sale of soft drink concentrates. The agency urges that PepsiCo will be primarily interested in the sale of its own cola concentrates and to the extent that it is interested in selling non-cola drinks it will be faced with a conflict between pushing its own PATIO line and the Flavette brands. Moreover, the Commission is concerned that PepsiCo will dispose of the beer business of Rheingold and that this would deprive Flavette of the benefit of Rheingold's total resources in its efforts to establish itself as a "toehold" competitor in the soft drink concentrate industry. While granting that Flavette's business is a small part of Rheingold's overall operation, the Commission believes that its competitive potential rests upon Rheingold's full resources and therefore a divestiture limited to disposing of the offending lines of commerce alone could not provide effective relief. Admitting that PepsiCo will be harmed at this stage of the proceeding if it is required to refrain from exercising control of Rheingold, the Commission has advised that it will set up an expedited time schedule ensuring that all administrative proceedings, including the Commission's final decision, will be concluded by September 10, 1973. It therefore urges this Court to enjoin PepsiCo from taking any steps to assume or exercise control of Rheingold, from taking any other action which will change or influence the present directors or management of Rheingold, diminish its operations, change its corporate structure or dispose of any of its assets.

■ Under FTC v. Dean Foods Co., *supra*, the Supreme Court has held that an injunction can issue only if the Commission can show that "an effective remedial order, once the merger was im-

---

6. The particular significance of Section 5 of the Federal Trade Commission Act as a basis for relief here is not apparent either from an examination of the complaint or the brief of the Commission before us. It may eventually articulate its views. See FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). In the meantime we assume that the violation of Section 7 of the Clayton Act also constitutes a violation of Section 5. Stanley Works v. FTC, *supra*, 469 F.2d at 499 n. 2.

plemented, would otherwise be *virtually impossible,* thus rendering the enforcement of any final decree of divestiture futile." 384 U.S. at 605, 86 S.Ct. at 1743 (emphasis added).[7] While the Commission has persuaded us that there is a reasonable probability that the merger here will violate Section 7 of the Clayton Act, we are totally unpersuaded that a remedial divestiture order will ultimately be "virtually impossible" of achievement. The Commission is proceeding on the premise that divestiture of the entire Rheingold company will be the only effective remedy. On the contrary we see no reason why such drastic relief at least at this stage, should be presumed appropriate. Assuming that the Commission is successful in its adjudicatory proceeding, whether the divestiture should be total or partial must depend upon the facts in each case.[8] It is clear here that the only offending assets are the subsidiary businesses of Flavette and Mason & Mason which represent a minor though profitable segment of Rheingold's business.

The Commission's major if not sole argument that total divestiture is necessary, is that Flavette will need the total resources of Rheingold plus the expressed determination of its incumbent management to break into the soft drink industry. The record before us gives scant support, if any, to the proposition that the present Rheingold management has that capacity. Rheingold's share in the beer market is declining. It lost money in 1972 on its beer operation and projects a loss of between $2 million and $7 million in 1973. No final budget plan has been developed in fact for the 1973 brewery operation. We have examined affidavits before us which indicate that Rheingold's cash position is precarious. Rheingold's earnings per share have declined from $1.84 in 1970 to $1.25 in 1971 and are estimated at $.45 per share in 1972. In December, 1972, Rheingold announced the omission of its regular quarterly cash dividend. Rheingold has emphasized its beer business and Flavette is not prospering. Flavette has incurred losses of more than a half million dollars from the time of its acquisition by Rheingold in the fall of 1970 to December 31, 1972. Its share in the total soft drink concentrate market has declined from .5% in 1968 to .3% in 1971.

The Commission in oral argument suggested that the present management of Rheingold was contemplating the acquisition of another regional beer manufacturer, Piels, as a possible means of increasing its business. It is somewhat anomalous that the Commission should cite an obvious horizontal merger, which it admittedly has not studied, as a basis for preserving Rheingold. The Commission also cites as persuasive the statement of Rheingold's Chairman on the

---

7. The Commission's brief seems to argue that all it must establish is that an ultimate effective order will *probably* be effectively impaired unless Rheingold's separate existence and incumbent management is preserved. The Supreme Court has placed a much greater burden on the Commission. It must establish no probability here but "virtual impossibility." In view of the extraordinary nature of the remedy proposed, the burden is justifiably imposed.

8. While complete divestiture is "simple, relatively easy to administer, and sure" (United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 331, 81 S.Ct. 1243, 1252, 6 L.Ed.2d 318 (1961)), it is not necessarily the most appropriate means for restoring competition. A primary concern is whether the offending line of commerce, if disassociated from the merged entities, can survive as a viable, independent entity. See, e. g., OKC Corp. v. FTC, 455 F.2d 1159 (10th Cir. 1972) (partial divestiture inappropriate since the offending line of commerce could not survive independently). See also Comment, Divestiture of Illegally Held Assets: Observations on its Scope, Objective, and Limitations, 64 Mich.L.Rev. 1574, 1587–1588 (1966). Many other factors, however, are relevant and must be considered. United States v. Reid Roller Bit Co., 274 F. Supp. 573, 584–592 (W.D.Okl.1967) (partial divestiture appropriate).

Flavette acquisition that combination of selling beer and soft drinks "provides Rheingold with a good deal of clout in the supermarkets." The antitrust significance of this sort of "clout" also seems to have escaped the agency which is charged with the enforcement of Section 3 as well as Section 7 of the Clayton Act.

■ We must balance the equities when a supplicant seeks injunctive relief [9] and we find that PepsiCo has invested $57 million in acquiring an 83% interest in a company, including substantially all of the stock of a management which the Commission insists remain at the helm. PepsiCo is opposed to a Piels acquisition as imprudent and detrimental to the interests of PepsiCo as well as the minority stockholders of Rheingold. We of course cannot predict whose business judgment is sounder but the Commission is in no better position. It did not seek to enjoin the acquisition of the shares by PepsiCo and in view of the *fait accompli* of 83% control and the staggering investment made, we are not persuaded that we should deprive PepsiCo of its corporate managerial responsibilities particularly when incumbent management has divested itself of its stock interests.

■ While it is elementary that PepsiCo's intentions in acquiring Rheingold are not to be considered in determining whether a Section 7 Clayton Act violation occurred, it is helpful to examine them now in light of the extraordinary relief which is sought. PepsiCo very probably has no interest in the beer business and in fact urges that its acquisition was motivated by Rheingold's diversion of the income from the soft drink bottling business to salvage its beer business, to the detriment of its PepsiCo franchises in Puerto Rico, Mexico City and California. PepsiCo argues that Rheingold was not properly expanding and exploiting certain territorial

markets which could be profitable to PepsiCo. PepsiCo further urges that it will make capital investments and operational changes which will maximize the earnings potential not only of Rheingold but Flavette. PepsiCo states flatly that third parties have already indicated an interest in purchasing Flavette. We therefore do not find that Flavette's viability as a competitor in the soft drink business will be at all assured by the perpetuation of Rheingold as it is presently constituted and managed. Nor are we persuaded that the separation of Flavette if it is eventually ordered, will be virtually impossible of achievement.

While we are fully aware of the fact that there may well be a difference between promise and performance, any doubt in our mind is dissipated by PepsiCo's willingness to enter into a hold-separate agreement to preserve and protect the Rheingold concentrate and domestic soft drink bottling assets so that the Commission and this Court, in the event that a violation of Section 7 shall be found, will be able to order effective divestiture relief. To this end PepsiCo has advised that the Flavette subsidiaries and the Mason & Mason root beer concentrate operations will be operated as a separate identifiable business entity, that the presently utilized trademarks and trade names will be preserved and protected by that entity and will be continued to be used by it to identify the products involved. In the event of a divestiture order, the business entity will have assets, facilities and equipment and a sales and distribution system equal to that which it had before the acquisition of PepsiCo. Even if divestiture of the franchised bottling operation in the United States is ordered, PepsiCo has agreed that assets, facilities and equipment, sales and distribution systems will be equal to or better than before the PepsiCo acquisition. Moreover, PepsiCo has announced its agreement to

9. United States v. Ingersoll-Rand Co., *supra*, 320 F.2d at 525; United States v. Atlantic Richfield Co., *supra*, 297 F. Supp. at 1073–74.

continue to sell Flavette through Rheingold bottlers and to guarantee that Flavette sales will increase at at least the industry rate during the pendency of the complaint. Realistically in view of the necessity of Rheingold to deal with labor problems, the banking industry and the business community during this crucial period, it would appear to us to be totally inequitable to prevent PepsiCo from now guiding and operating this company when long range decisions vitally affecting its stockholders must be made. At the same time we see no great hardship in requiring PepsiCo to continue the Rheingold beer operation and to maintain its assets until such time as the expedited administrative proceedings are terminated.

In the light of all the circumstances, we conclude that no preliminary injunction should issue here on the condition that the proposed hold-separate agreement be promptly entered into by the parties. We add two further conditions:

First, that the proposed escape clause giving PepsiCo the unilateral option of terminating the agreement on 30 days' prior written notice to the Commission be eliminated.

Second, that the new management agree not to divest Rheingold of its beer business or assets or any part thereof pending the resolution of the expedited action promised by the FTC for its administrative proceedings. The Commission and PepsiCo are directed to enter into such an agreement and the temporary restraining order of this Court will be thereupon dissolved.

Jurisdiction is retained for the purpose of enabling any of the parties to this proceeding to apply to this Court for such orders and directions as may be necessary for the construction or carrying out of this order, for the modification of any provisions thereof, and for the enforcement of and compliance therewith and punishment for violations thereof.