**ADOLPH COORS COMPANY,**
Petitioner-Appellant,

v.

**FEDERAL TRADE COMMISSION,**
Respondent-Appellee.

No. 73–1567.

United States Court of Appeals,
Tenth Circuit.

June 4, 1974.

Leo N. Bradley, Golden, Colo. (Earl K. Madsen, Golden, Colo., on the brief), for petitioner-appellant.

Robert E. Duncan, Washington, D. C. (Calvin J. Collier, Gen. Counsel, Gerald Harwood, Acting Asst. Gen. Counsel, W. Baldwin Ogden, Washington, D. C., on the brief), for respondent-appellee.

Before HOLLOWAY and BARRETT, Circuit Judges, and DURFEE,* Judge Court of Claims.

BARRETT, Circuit Judge.

Adolph Coors Company appeals an Order to Cease and Desist issued by the Federal Trade Commission. The FTC filed a complaint alleging that Coors was engaged in anticompetitive practices in violation of Section 5 of the Federal Trade Commission Act.[1] An Initial Decision was issued by the Administrative Law Judge after hearings were conducted in Denver extending over a period of thirty days. The Law Judge found that Coors had not violated the Act. He recommended that the complaint be dismissed. The FTC appealed the Initial Decision to the five-member Federal Trade Commission. The Commission substituted its findings for those of the Law Judge and found, as a matter of

---

* Honorable James R. Durfee, sitting by designation.

1. Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45, provides in part:
　　(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

\* \* \* \* \*
　　(6) The Commission is empowered and directed to prevent persons, partnerships, or corporations, . . . . from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce.

law, that Coors had violated Section 5 of the Act.[2]

Adolph Coors Company, a Colorado corporation, is engaged in brewing, dis-

2. The Commissioners ordered that Coors cease and desist from :

1. Entering into, maintaining or enforcing any contract, agreement, combination, understanding or course of conduct which has as its purpose or effect the fixing, maintaining, establishing or setting of the prices at which distributors sell Coors beer to retailers or the prices at which retailers sell Coors beer to consumers.

2. Publishing, disseminating or providing any price list or other document indicating suggested or mandatory prices for the sale of Coors beer by any distributor to any retailer or any price list or other document indicating suggested or mandatory prices for the sale of Coors beer by any retailer to any consumer. * * *

3. Publishing, disseminating or providing to any distributor or any retailer any information or suggestions concerning what Coors may believe to be an appropriate or proper mark-up or profit for Coors beer when the distributor sells to the retailer or when the retailer sells to the consumer or a mark-up or profit below which the distributor or retailer is advised not to sell Coors beer. * * *

4. Refusing to sell beer to any Coors distributor or terminating or threatening to terminate any Coors distributor because :

A. the distributor has in the past or might in the future sell Coors beer at prices, mark-ups, or profits different from those approved or recommended by respondent ;

B. one or more of the distributor's customers sold Coors beer or advertised Coors beer for sale at prices, markups, or profits different from those approved or recommended by respondent ;

C. the Coors distributor sold Coors beer to another distributor or to a retailer whose business is located outside of the territory granted to the distributor ; or

D. the Coors distributor distributes, has distributed, or proposes to distribute in the future the product of another brewer.

5. Entering into, maintaining or enforcing any contract, agreement, combination, understanding or course of conduct to fix, establish, limit or restrict the territory in which or the persons to whom a distributor may sell Coors beer. * * *

6. Allocating Coors beer among its distributors in times of beer shortage at the Coors brewery, by any means other than by allocating shares to distributors equal to their proportionate purchases of Coors beer from the brewery during the last three months before the allocation or when the distributor has not been in business for more than a

year as a Coors distributor, on some other equitable basis.

7. Refusing to deliver all of a distributor's order because the distributor has made sales to customers outside of the territory granted the distributor or because the distributor or the distributor's customer is selling Coors beer at prices, mark-ups or profits lower than those approved by respondent.

8. Prohibiting its distributors from selling for central warehouse delivery ; provided, however, that respondent can establish refrigeration standards for the central warehouse which are substantially similar to those established for distributors and can require its distributors to be responsible, directly or indirectly, for maintenance of such refrigeration standards and for rotation of Coors beer in the central warehouse and at the retail delivery locations where the beer is redelivered from the central warehouse, if respondent changes its container dating system so that the retailer and the consumer will recognize the date without reference to a code or measuring stick.

9. Entering into, maintaining or enforcing any contract, agreement, combination, understanding or course of conduct with its distributors which has as its purpose or effect requiring that retailers serve Coors draught beer as their only light-colored draught beer.

10. Entering into, maintaining, or enforcing any contract, agreement or understanding, or taking any action or course of conduct with any of its distributors which has as its purpose or effect the requirement that the distributor eliminate, or refrain from obtaining and handling rival brands of beer in order to become or remain a Coors distributor.

11. Hindering, suppressing or eliminating competition or attempting to hinder, suppress or eliminate competition between or among distributors or between or among retailers handling Coors beer.

12. Cancelling any distributor agreement unless and until the respondent has pursued the following procedure :

A. Cancellation With Cause

(a) Respondent has given the distributor sixty days' notice of respondent's intention to cancel its agreement with the distributor ; . . . .

B. Cancellation Without Cause

(a) Respondent has given the distributor one hundred and eighty days' notice of respondent's intention to cancel its agreement with the distributor ;

. . . .

13. IT IS FURTHER ORDERED that respondent, within three (3) months from the date this Order becomes final, shall pro-

tribution and sale of beer, using the trade name of "Coors". Coors has one brewery in Golden, Colorado, and distributes its beer in an eleven-state area. The beer is sold to the distributors who in turn sell to retailers. While Coors is the fourth largest beer brewer in the United States, it alone among the nation's some 70 brewers is a "shipping" brewery, i. e., Coors ships all of the beer brewed at its single "regional" brewing plant at Golden, Colorado, F.O. B. to the various distributors in Arizona, California, Colorado, Idaho, Kansas, Nevada, New Mexico, Oklahoma, Texas (some counties only), Utah and Wyoming. In 1971 the average barrel of Coors beer traveled 961 miles to its market place.

The beer is made by the aseptic brewing process which requires refrigerated marketing. It is uncontroverted that Coors beer is substantially more expensive than any other beer consumed in the United States, and yet because of its popularity, Coors has climbed from the 49th largest brewery in 1948 to its number 4 position today. Coors maintains market leadership in total sales against all competitors except in its territory served in Texas. Because of the delicacy of the product, it is essential that the refrigeration controls and expeditious marketing techniques be strictly monitored. Once the beer is delivered to the distributors, this obligation is assumed by them under an agreement with Coors. It is the distributor who is required to protect the "integrity" of the Coors beer quality by guarding against a retailer's failure to rotate the beer, and failure to insure proper refrigerated storage. Coors beer retained over 90 days must be destroyed.

Coors has 35 area representatives to help market the product. Each representative is assigned certain distributors to work with and to see that Coors' Policy Manual is followed. The price Coors charges to its distributors is set by Coors. Coors suggests to its distributors and retailers the price at which to sell its beer.

Each distributor is assigned a territory in which to market Coors' products. Coors may reduce the territory or add distributors to a particular territory. There are 166 independent distributors and one wholly owned subsidiary company.

In 1964 Coors eliminated sales to central warehouse accounts. Central warehouse accounts are either retailers such as large chain supermarkets who buy for redelivery to their own outlets, or independents who purchase for redelivery to nonaffiliated retail outlets or retailer warehouses.

Coors favors draught accounts. It has a draught policy in which tavern owners are given 30 days to discontinue handling other brands of light draught beer. If the owner-retailer continues to sell another brand of light draught beer, Coors discontinues its supply of light draught beer to the tavern.

The contract between Coors and the distributors enables Coors to cancel its contract for any breach by the distributor, with a five-day notice. Either Coors or the distributor may cancel the contract without cause with a 30-day notice.

Coors contends that: (1) it did not engage in wholesale or retail price fixing; (2) its vertically imposed territories are reasonable and legal; (3) it has no policy of requiring exclusive draught accounts; (4) it has the right to protect its quality product and not distribute its beer through central warehousing; (5)

vide for arbitration, in the city in which a distributor resides, by an independent and neutral arbitrator, to determine in the case of any announced termination, and upon the request of a distributor, whether or not said termination is made in good faith (in the case of termination without cause) or whether or not said termination is made in

good faith and for material violation of one or more contract provisions which are relevant to the effective operation of the franchise (in the case of termination with cause). * * * *

/s/ Charles A. Tobin
Secretary

ISSUED: July 24, 1973

its contract termination rights are reasonable and legal; (6) the provisions of the Commission's Order are not supported by substantial evidence, are not reasonable, and are in conflict with important public policies; (7) the FTC internal procedures have prejudiced its right to a fair hearing; and (8) this court must exercise its power and set aside the Commissioner's Order.

## I.

Coors contends that it did not engage in price fixing agreements with its distributors. Its practices are set out in the Coors Policy Manual which states as follows:

> In order to maintain a successful wholesale or retail business, pricing integrity is essential. Pricing integrity will result in an adequate and equitable profit to both Distributor and retailer and is fair to the ultimate consumer.

> It is the policy of the Adolph Coors Company to suggest, if it so chooses, to either the wholesaler or retailer level, suggested minimum pricing. We reserve the right to further that policy by simply refusing to deal with anyone who doesn't adhere to said policy.

> The Adolph Coors Company and its agents must only state the policy. They cannot make agreements, threaten, coerce, or intimidate wholesalers or retailers in any manner. They can enforce the policy only by reserving the right to refuse to deal with those who don't adhere to the suggested prices.

Coors' sales manager, Harvey Gorman, testified that the product is controlled by agreeing individually with each distributor. This policy is enforced by a provision in the contract between Coors and the distributor enabling Coors to terminate a distributorship in 30 days without cause. Since there are about 7,000 applicants for distributorships, any distributor who does not conform to Coors' pricing policies could readily be replaced. Coors' area representatives constantly obtain wholesale price information and send the information to the home office in Golden. The area representatives also resolve any conflicts between the prices proposed by a distributor and those suggested by Coors.

John Hemphill, a former Coors distributor, testified that he would only go so far in making a request to use his own prices, knowing that Coors could terminate him in 30 days. He also testified that a Coors' area representative told him that the best thing for him to do is not to be a distributor if he could not agree to Coors' policies on pricing and territories. The Law Judge had questioned Hemphill's credibility because of a suit he has pending against Coors, but the Commissioners rejected this fact as bearing on the issue of credibility.

Jay Wagnon, a Coors' distributor, testified that Coors insisted on controlling distributor price increases and that when he refused to adopt wholesale prices suggested by the Coors' area representative he was summoned to Golden and requested to change his prices. He stated that Coors' personnel told him to bring his prices in line with Coors' recommendations or they could put another distributor in his area. He testified that he was afraid; that he had been threatened; and that he therefore conformed to the suggested prices. The Law Judge did not find Wagnon's testimony credible. The Commissioners, on the other hand, found that his testimony was credible.

Jay Thurman, a former distributor, testified that he was given pricing sheets by the area representative which were to be followed. He was told that if the prices were changed, it would go through Mr. Straight, a Coors official, who, in turn, would determine if the changes were justified.

Peter Tinetti, a former distributor, testified that Coors sent him the prices at which to sell Coors beer.

The area representatives submitted reports to the Golden headquarters

about agreements or understandings they had made with distributors on wholesale prices.

■■ Price fixing is illegal *per se* under the Sherman Antitrust Act. 15 U.S.C.A. § 1; Northern Pacific Railway Co. v. United States, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Price fixing is also illegal *per se* under Section 5 of the Federal Trade Commission Act. 15 U.S.C.A. § 45. Prices are fixed when they are agreed upon. United States v. Masonite Corporation, 316 U.S. 265, 276, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942). The agreement to fix prices renders the conspiracy illegal. The agreement may be inferred or implied from the acts and conduct of the parties, as well as from surrounding circumstances. Pearl Brewing Co. v. Anheuser-Busch, Inc., 339 F.Supp. 945 (S.D.Tex.1972); National Macaroni Manufacturers Association v. Federal Trade Commission, 345 F.2d 421 (7th Cir. 1965).

. . . . the test . . . . is whether the agreement, or conduct, interferes with the freedom of sellers or traders in such a manner as to prohibit or restrain their ability to sell in accordance with their own judgment, and not what particular effect the agreement or conduct, has on the actual prices.

339 F.Supp. 945 at 952.

■■ The findings of the Commission must be accepted by this court if there is substantial evidence on the record considered as a whole to support them. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Commission's overruling of the Law Judge's findings on the credibility of two witnesses is not required to be supported by a very substantial preponderance of the evidence. Federal Communications Commission v. Allentown Broadcasting Corp., 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955). And where there is a possibility of drawing two inconsistent inferences from the evidence, the Commission is not prevented from drawing one. National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L. Ed. 1305 (1942); *National Macaroni, supra*. If the inference is supported by substantial evidence, it cannot be set aside even though the court could draw a different inference. *National Macaroni, supra*.

■■ The Commission must consider the initial decision of the Law Judge and the evidence in the record on which it was based. Cinderella Career and Finishing Schools, Inc. v. Federal Trade Commission, 138 U.S.App.D.C. 152, 425 F.2d 583 (1970). But the findings and conclusions of the Law Judge are not sacrosanct and are not necessarily binding on the Commission or the court; they are part of the record to be considered on appeal. OKC Corp. v. Federal Trade Commission, 455 F.2d 1159 (10th Cir. 1972). When the Law Judge and the Commission reach opposite results, the Law Judge's findings should be considered on review and given such weight as they merit within reason and the light of judicial experience. But this does not modify the substantial evidence rule in any way. *OKC Corp., supra*.

■ There is substantial evidence from the record as a whole to support the Commission's findings of price fixing agreements between Coors and its distributors.

Coors also challenges the Commission's finding that Coors has a resale price maintenance program and that it has in some cases secured adherence to its suggested retail prices by unlawful means. There is substantial evidence to support the Commission's finding.

Coors' policy is to establish pricing integrity which means that a certain profit is allowed on each level of resale. Pricing integrity is not possible with price discounting. Coors implements pricing integrity by refusing to deal with anyone not adhering to its price

suggestions. A Coors' area representative threatned to refuse further sales to an offending retailer unless he would adhere to the prices suggested by Coors. Coors used its distributors to secure retailers' adherence to suggested minimum prices. One area representative reported that a retailer was cut off by a distributor because the retailer was advertising Coors beer at cut prices. Another area representative reported that a distributor planned to take appropriate action against a retailer who refused to sell at suggested prices. A distributor reported that Coors beer was not delivered to a retailer who cut prices. An area representative reported that action would be taken against a retailer who refused to raise his prices to a profit level.

Mr. Letcher, a retailer, testified that he was selling Coors at special weekend prices and that he was warned by the Coors distributor to discontinue the practice. Letcher refused to cooperate and the distributor terminated deliveries to his store. The distributor told Letcher that deliveries would be received if he would agree not to discount the beer, and that Letcher might lose the retail account if he continued to discount the beer. Letcher was also told by the distributor that Coors does not tolerate price cutting. Letcher sold his business. The distributor resumed deliveries to the new owners who agreed not to discount the beer. The distributor did not act independently in cutting off Letcher as Coors suggests, but cut him off in accordance with Coors' pricing policies.

 United States Supreme Court decisions hold that if a manufacturer advances beyond a simple refusal to deal and takes affirmative action to secure compliance with its prices, a combination in violation of Section 1 of the Sherman Antitrust Act and Section 5 of the Federal Trade Commission Act occurs. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Federal Trade Commission v. Beech-Nut Packing Company, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922). Any trespass on the independence of a reseller or wholesaler to set his own prices is a violation of the Sherman Act. *Pearl Brewing Co., supra.* A seller may refuse to deal with one failing to adhere to its specified prices, United States v. Colgate & Company, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), but where a concerted effort is used to interfere with the distributors' pricing independence and to compel them to adhere to suggested prices, there is a violation of the Sherman Antitrust Act. A manufacturer may choose those to whom it will sell to as long as its conduct has no monopolistic purposes. Colorado Pump & Supply Company v. Febco, Incorporated, 472 F.2d 637 (10th Cir. 1973), cert. denied 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973).

The Commission found that:

. . . . [Coors] has pursued a policy of fixing, controlling and maintaining prices at which Coors beer is sold at both the wholesale and retail level, that in furtherance of this policy it has engaged in various acts and practices such as: suggested resale prices to both distributors and retailers, checking prices at which distributors and retailers sell Coors beer, advising distributors and retailers that it is contrary to Coors pricing policy for them to deviate from prices approved by respondent, threatening to terminate distributorships and threatening to force distributors to sell their businesses for refusing to adhere to suggested retail prices, entering into agreements and understandings with distributors as to the wholesale prices which the distributors will charge for Coors beer, joining with distributors in attempting to coerce retailers to refrain from selling Coors beer at prices below those approved by respondent, encouraging distributors to prevent retail price cutting by refusing to deliver Coors beer to price cutters, or to reduce the amount of beer delivered, and entering into agreements and understandings with retailers as to the retail prices or

range of prices at which such retailers will sell Coors beer.

There is substantial evidence in the record to support the Commission's findings.

## II.

Coors alleges that its vertically imposed territories are reasonable and legal. The Commission held that Coors vigorously enforces its territorial restrictions and that it has engaged in unlawful price fixing which is:

> . . . . [s]trong grounds for presuming that the most injurious effects of vertical territorial divisions may be operative, and, therefore, for holding the entire arrangement of territories with price fixing illegal per se.

The Coors' distributor contract provides, in part, as follows:

> While this agreement is in effect the Distributor will conduct the business of wholesale distribution of Coors Beer in the above territory only
> . . . .

In United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L. Ed.2d 1249 (1967), the United States brought an antitrust action against Arnold, Schwinn & Co., an association of Schwinn distributors and a Schwinn distributor, seeking a declaratory judgment to invalidate the distribution franchising system of its products. Schwinn bicycles are shipped directly to franchised retailers who agree to sell only to ultimate consumers. Schwinn also distributed its bicycles to franchised distributors who agreed not to resell to anyone outside their assigned territories. The Court held that:

> Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. White Motor, [Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963)]; Dr. Miles [Medical Co.

v. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911)]. Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale.

388 U.S. at 379.

The rule of law in Schwinn is clear and unequivocal.

> Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a per se violation of § 1 of the Sherman Act. 388 U.S. at 382.

See Federal Trade Commission v. Sperry & Hutchinson Co., 405 U.S. 233, 247, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); Williams v. Independent News Co., Inc., 485 F.2d 1099 (3rd Cir. 1973); Warriner Hermetics, Inc. v. Copeland Refrigeration Corporation, 463 F.2d 1002 (5th Cir. 1972), cert. denied 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972); Beverage Distributors, Inc. v. Olympia Brewing Co., 440 F.2d 21 (9th Cir. 1971), cert. denied 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971); Fontana Aviation, Inc. v. Beech Aircraft Corporation, 432 F.2d 1080 (7th Cir. 1970), cert. denied 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 826 (1971). Cf. Carter-Wallace, Inc. v. United States, 449 F. 2d 1374, 196 Ct.Cl. 35 (1971); Tripoli Company v. Wella Corporation, 425 F.2d 932 (3rd Cir. 1970), cert. denied 400 U. S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); LaFortune v. Ebie, 26 Cal. App.3d 72, 102 Cal.Rptr. 588 (Cal.Ct. App.1972).

Coors, a manufacturer, enters into an agreement with its distributors

to distribute Coors beer in the assigned territory only. Coors maintains that the territorial restrictions are necessary to retain the quality and proper refrigerated handling of its beer, and that the territorial restrictions are legal. However, since Coors parts with title and risk to the product when it sells and delivers the beer to distributors, and thus has parted with dominion over the product, its further effort to restrict the territories or persons to whom the product can be transferred is a *per se* violation of Section 1 of the Sherman Act and Section 5 of the Federal Trade Commission Act. Coors may still condition its sales to distributors and others upon maintenance of procedures necessary to control the quality of the product.

Although we are compelled to follow the *Schwinn per se* rule rendering Coors' territorial restrictions on resale illegal *per se,* we believe that the *per se* rule should yield to situations where a unique product requires territorial restrictions to remain in business. For example, speed of delivery, quality control of the product, refrigerated delivery, and condition of the Coors product at the time of delivery may justify restraints on trade that would be unreasonable when applied to marketing standardized products. La Fortune v. Ebie, *supra.* Perhaps the Supreme Court may see the wisdom of grafting an exception to the *per se* rule when a product is unique and where the manufacturer can justify its territorial restraints under the rule of reason. White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

The dissenters in *Schwinn* contended that the new *per se* rule cannot be justified, automatically invalidating vertical restraints in a distribution system based on sales to wholesalers and retailers.

. . . the Court has, *sua sponte* created a bluntly indiscriminate and destructive weapon which can be used to dismantle a vast variety of distributional systems—competitive and anticompetitive, reasonable and unreasonable.

388 U.S. at 394.

Thus we are forcelosed from considering the reasonableness of the restriction or its business justification. We are cognizant of the unpredictability which is created in relationship to the Coors operation.

### III.

Coors contends that it has no policy of requiring exclusive draught accounts. The Commission found that Coors combined with its distributors in the practice of encouraging and coercing retailers to sell Coors draught beer to the exclusion of light draught beer competitors in violation of Section 5 of the Federal Trade Commission Act.

Mr. Coors testified that exclusive draught accounts were desirable. Several distributors testified that the purpose of obtaining exclusive draught accounts is to encourage draught customers to buy beer to take home. To implement the policy, Coors threatened to terminate a retailer's supply of Coors draught beer unless he eliminated competitive draught beers within 30 days. Coors' distributors did, in fact, take out their Coors draught beer if the retailer did not comply with the policy.

Agreements foreclosing a competitor's products are unlawful. Federal Trade Commission v. Brown Shoe Co., Inc., 384 U.S. 316, 86 S.Ct. 1501, 16 L. Ed.2d 587 (1966); Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Standard Fashion Company v. Magrane-Houston Company, 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922). The policy of pursuing an exclusive draught policy violates Section 5 of the Federal Trade Commission Act. There is substantial evidence in the record to support the Commission's finding.

## IV.

■ Coors asserts that it has the right to protect its quality product and not distribute its beer through central warehousing. The Commission held that Coors' prohibition of central warehouse sales, or a requirement that wholesale prices to those accounts equal those to other retailers is a substantial restraint on the capacity of the distributor to resell to whomever he chooses and threatens the same anticompetitive results as other illegal restraints on alienation. Therefore, the Commission found that the practices are unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act.

The central warehouse method of distribution involves purchase by the warehouser of beer from the brewer or the distributor. The beer is delivered by the retailer to its outlets. This method of distribution could cut the price of the beer to the retailer and consumer. Coors eliminated sales to central warehouse accounts in 1964. The distributors viewed central warehousing as a threat to the integrity of their territorial restrictions. Coors alleges that sales to central warehousers affects the quality of its beer because of poor procedures used by the warehousers.

The Order imposed by the FTC does not prevent Coors' distributors from conditioning its sales to central warehouse accounts on the maintenance of procedures necessary to the quality control of its products. The Order only enjoins Coors from requiring its distributors from refusing to sell to central warehouse accounts. The restriction by Coors, limiting those with whom the distributors may deal, amounts to a restriction on resale and violates the mandates of *Schwinn* and the Federal Trade Commission Act. There is substantial evidence in the record to support the FTC's finding.

## V.

Coors alleges that its contract termination rights are reasonable and legal and that its conduct in the rare instances of its use has been proper and legal in every respect. The Commission held that:

Whether or not any actual terminations of Coors distributors, or sales forced by threat of termination can be ascribed entirely, solely and unambiguously to the failure of the terminated or coerced distributor to participate in an antitrust violation, it is abundantly clear from the record in this case that Coors representatives have used the explicit or implicit threat or speedy termination is often successful in efforts to force the acquiescence of its distributors in anti-competitive behavior.

The Coors distributor contract provides in part as follows:

This agreement and any supplements now or hereafter effective (whether fixing prices and terms to the Distributor, or otherwise) may be cancelled in entirety at any time by the Company for any breach by the Distributor on five (5) days' written notice to the Distributor. This agreement and such supplements may be cancelled in entirety by either party without cause upon the giving of notice to that effect to the other party, in which event termination shall become effective thirty (30) days after delivery or the mailing of the written notice of cancellation, whichever first occurs. * * *

■ The Commission held that Coors used the threat of speedy termination to force its distributors into anti-competitive behavior. There is substantial evidence in the record to support the Commission's holding.

■ Coors has the right to terminate distributors according to the contract provisions which the distributors have agreed to. Bushie v. Stenocord Corporation, 460 F.2d 116 (9th Cir. 1972). However, it may not use the contract termination provisions to force its distributors into anticompetitive behavior.

The Law Judge was correct in stating that the termination provisions of Coors and its distributors, based upon their contractual obligations, are a matter of private contract and are not subject to interference by third parties. The termination provisions are reasonable but may not be used by Coors to force any unlawful conduct. Therefore the Commission's attempt to rewrite Coors' contract termination provisions in paragraphs 12 and 13 of its Order must be set aside. The contract termination provisions do not violate Section 5 of the Federal Trade Commission Act.

## VI.

Coors alleges that FTC internal procedures have prejudiced its right to a fair and impartial hearing. Coors asserts that Mr. Steinitz, a staff attorney of the FTC, performed investigative and prosecuting functions in preparing the case against Coors, and that he also participated in the review of the case as attorney-advisor to Commissioner Paul Rand Dixon in violation of 5 U.S.C.A. § 554(d) and 16 CFR 4.7(a).

Coors' contention was not raised in the administrative proceeding and therefore is not properly before this court. Moog Industries, Inc. v. Federal Trade Commission, 355 U.S. 411, 78 S. Ct. 377, 2 L.Ed.2d 370 (1958). In any event, Coors' contention has no merit because Mr. Steinitz, in an affidavit in the record, states that upon leaving FTC's staff he did not discuss the merits of the Coors case with any of the Commissioners or the Commission's trial staff. There was no error.

## VII.

Coors alleges that the provisions of the Commission's Order are not supported by substantial evidence, are not reasonable, are in conflict with important public policies, and must be rejected. It alleges that Paragraphs 4C, 5 and 7, if adopted, would force it to abandon its right to choose those it will authorize to serve as its distributors in its marketing area, eliminating its ability to obtain required market penetration for its survival. Coors states that Paragraph 6, a formula devised by the FTC for beer rationing, is too simplistic to work effectively for Coors.

The Order by the Commission is reasonably related to the violations by Coors. The Commission is vested with wide discretion in its choice of remedy to cope with unlawful practices, and its choice will not be disturbed unless it has no reasonable relation to the unlawful practices found. Federal Trade Commission v. Mandel Brothers, Inc., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed. 2d 893 (1959); Jacob Siegel Co. v. Federal Trade Commission, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888 (1946). Once the Government has borne its burden of establishing violations of the law, all doubts about the remedy are resolved in its favor. United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 81 S. Ct. 1243, 6 L.Ed.2d 318 (1961).

We hold that paragraphs 1 through 11 of the FTC's Order are enforced; paragraphs 12 and 13 of the FTC's Order are set aside.

HOLLOWAY, Circuit Judge (concurring in part and dissenting in part):

I fully concur in the well-reasoned opinion of the court in upholding paragraphs 1 through 11 of the Commission's order and disagree only as to the setting aside of paragraphs 12 and 13.

It is true that paragraphs 12 and 13 require a substantial change in the contract provisions on termination of distributorships. However, the Commission has found that it is abundantly clear that Coors representatives have used the explicit or implicit threat of speedy termination in efforts to force acquiescence of its distributors in anticompetitive behavior. We are agreed that there is substantial evidence in the record to support the finding.

The Commission has wide discretion in its choice of a remedy deemed adequate to cope with unlawful practices in

this area of trade and commerce. See Siegel Co. v. FTC, 327 U.S. 608, 611, 66 S.Ct. 758, 90 L.Ed. 888. The courts interfere only where there is no reasonable relation between the remedy and the violation. Atlantic Refining Co. v. FTC, 381 U.S. 357, 377, 85 S.Ct. 1498, 14 L.Ed.2d 443. And orders affecting contractual relationships have been upheld where unlawful practices involved similar subtle pressures and threats of termination of dealers' leases. Id. at 374–375.

On this record and the findings made I would uphold as reasonable the Commission's choice of a remedy to cope with the unlawful practices.