JOSIE STARKEY, Plaintiff-Appellant, *v.* ILLINOIS CIVIL SERVICE COMMISSION *et al.*, Defendants-Appellees.

First District (5th Division)    No. 80-2351

Opinion filed April 16, 1982.

SULLIVAN, P. J., dissenting.

Gerald A. Goldman, of Gerald A. Goldman, Chartered, of Chicago (Benjamin P. Hyink, of counsel), for appellant.

Tyrone C. Fahner, Attorney General, of Chicago (Karen Konieczny, Assistant Attorney General, of counsel), for appellees.

JUSTICE LORENZ delivered the opinion of the court:

Plaintiff Josie Starkey appeals from a circuit court order which affirmed an Illinois Civil Service Commission decision to discharge her from employment with the State. (Ill. Rev. Stat. 1979, ch. 127, par. 63b111a.) We reverse because the Commission's decision is against the manifest weight of the evidence. The following facts are material to our decision.

Starkey was employed as the claims manager of the Waukegan branch of the Illinois Department of Labor, Bureau of Employment Security (BES). In July of 1979 she was notified that she was being discharged based on the allegation that she processed a claim for unemployment benefits on behalf of her mother, Lillian McCoy, with knowledge that McCoy's claim was fraudulent. Starkey requested a hearing on the charges, and the Civil Service Commission appointed a hearing officer. (Ill. Rev. Stat. 1979, ch. 127, par. 63b111.) The evidence presented to the hearing officer shows that Lillian McCoy went to the Waukegan BES office on September 10, 1976, to apply for unemployment benefits under the Supplemental Unemployment Assistance (SUA) program. Starkey testified that, although it was not a regular part of her duties, she partially filled out a claims application for her mother and put

this form in the pile of SUA applications. She told her mother to wait for a claims taker to call her so that the application could be completed and her eligibility evaluated. Without this shortcut, her mother would have had to wait in one line only to be told that she had to go to a line for SUA claimants at the other side of the building. After putting the partially completed application in the SUA pile, Starkey went back to her office. Starkey further testified that she did not know that McCoy was not eligible for the $2,028 in benefits she eventually received.

Although McCoy's application was processed without being completely filled out, Starkey's supervisor, Miles Paris, testified that in September of 1976 it was not unusual for uncompleted applications to be processed. The SUA program was new at the time, and as the hearing officer found, "[I]n 1976, things were in a state of chaos at the Waukegan B.E.S. office."

In 1977, the Illinois Department of Law Enforcement (DLE) began an investigation of the Waukegan BES office, focusing on an employee named Marilyn Blye. Blye was Starkey's principal accuser at the hearing which resulted in this appeal. However, Blye was under indictment by the time the charges against Starkey were heard, and she did not testify against Starkey. Instead, Blye's unsworn and un-cross-examined "testimony" was given through two DLE agents who testified that during the course of their investigation they interviewed Blye at the Waukegan police station and at the office of the State's Attorney. According to one of the agents:

> "* * * I asked Marilyn Blye if there were any other employees in the local office in Waukegan who were involved in filing false claims. Blye replied that Josie Starkey had filed a false claim for her mother. She said that Josie Starkey brought the claim to her while she was at a computer terminal. She said she *thought* that Miss Starkey stated that her mother had not been working as listed in the claim.
>
> * * *
>
> Blye stated she *thought*, Blye *thought*, Starkey told her at the time that her mother had not been working as listed in the complaint."
> (Emphasis added.)

Despite the fact that the agent initially testified that Blye merely reported what she "thought" was Starkey's knowledge of a fraudulent claim, the agent later gave a much more damaging version of Blye's statements. According to this second version of the agent's recollection, Blye said that Starkey admitted to Blye that McCoy's claim was fraudulent. The agent further testified that Blye said that Starkey showed her how to enter a fraudulent claim in the BES computer.

The testimony of the second agent was similar to the more damaging

version of the first agent's testimony. However, the second agent also testified that Starkey had helped in the investigation of Blye, and that Blye believed that Starkey was responsible for Blye's own discharge.

At the close of the hearing, the hearing officer found that McCoy had not been entitled to the SUA benefits she received. "It is clear that a false claim was entered on behalf of claimant McCoy. It is not clear, however, that respondent Starkey participated in any way, except to a very small degree, in the processing of that claim." The "ultimate issue," as the hearing officer viewed the case, was whether Starkey knowingly participated in a scheme to defraud the State. Having had an opportunity to observe Starkey's demeanor while she testified, the hearing officer found that her testimony was truthful. Specifically, the hearing officer expressly found that "Starkey's testimony is credible," and "Her word is good." Moreover, the hearing officer found that: (1) Blye processed McCoy's partially completed application in an "attemp[t] to please her supervisor [Starkey] by 'taking care of' her relatives"; and (2) that Blye's statements to the DLE agents were motivated by her strong resentment toward Starkey.

Based upon his detailed 38-page report of findings and conclusions, the hearing officer concluded that the charges against Starkey had not been proved, and that she should be retained in her job.

After reviewing the record, but without having had an opportunity to observe the demeanor of the witnesses, the Civil Service Commission stated that "We cannot accept the proposition that Respondent, an experienced employee, could have by happenstance processed a fraudulent claim for her mother. Respondent's *defense* is not credible." (Emphasis added.) The Commission further concluded that the charges had been proved.

On appeal, Starkey contends (1) that the Commission lacked authority to discharge her because the charges were amended without being re-approved by the Director of the Department of Personnel, and (2) that the evidence is not sufficient to support the Commission's decision. The second issue is dispositive.

I

A. *Standard of Review*

Starkey argues that the Commission's findings are "against the manifest weight of the evidence." The Commission counters by arguing that there is "substantial evidence" to support the finding that Starkey acted with knowledge that her mother was ineligible for the requested benefits.

Our first task is to determine the appropriate standard of review.

Section 11 of the Administrative Review Act states that "The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1979, ch. 110, par. 274.) But, despite this presumption that the fact findings of administrative agencies are true and correct, it has been well-settled Illinois law that the findings of fact reached by administrative agencies must be based upon "substantial evidence." *Gibbs v. Orlandi* (1963), 27 Ill. 2d 368, 371, 189 N.E.2d 233; *Bruce v. Department of Registration & Education* (1963), 26 Ill. 2d 612, 622, 187 N.E.2d 711.

"On administrative review the issue is not whether the court approves the action taken by the administrative body but whether there was substantial evidence to support the decision." (*Heft v. Zoning Board of Appeals* (1964), 31 Ill. 2d 266, 270-71, 201 N.E.2d 364.) The supreme court explained, in *Menning v. Department of Registration and Education* (1958), 14 Ill. 2d 553, 558, 153 N.E.2d 52, that judicial review of administrative fact finding, under the Administrative Review Act, is comparable to the procedure used in determining whether there is "substantial evidence" to support the judgment of a lower court. See also McCormick, Evidence sec. 352 at 847 (2d ed. 1972).

The "substantial evidence" rule is the standard used for judicial review of administrative fact-finding in the Federal and in most State courts. (4 Davis, Administrative Law Treatise sec. 29.11, at 186 (1958).) Nevertheless, despite the line of Illinois cases which invoked the "substantial evidence" standard, the supreme court, in 1974, expressly rejected use of the " 'substantial evidence' standard as used in the Federal system for review of administrative matters." *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 358, 307 N.E.2d 371, *appeal after remand* (1979), 71 Ill. App. 3d 877, 390 N.E.2d 492.

Without mentioning or overruling the Illinois cases which have used the "substantial evidence" standard, the court held that "[u]nder the Administrative Review Act the permissible scope of judicial inquiry concerning factual determinations by administrative agencies has been limited to ascertaining if the agency decision was contrary to the manifest weight of the evidence. (*Davern v. Civil Service Com. of Chicago*, 47 Ill. 2d 469, 471-72, *cert. denied*, 403 U.S. 918.)" (*Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 358-59.) However, despite the fact that *Davern* is cited in support of the proposition that the sole test to be used in Illinois is the "manifest weight" standard, the court held in *Davern* that courts "are limited to a determination whether the final decision of the administrative agency is just and reasonable in light of the evidence presented." 47 Ill. 2d 469, 471. See also *Menning v. Department of Registration and Education* (1958), 14 Ill. 2d 553, 561 ("[T]his court is not bound to believe that facts in evidence establish a conclusion if the conclusion is not reasonable

\* \* \*"); and *Outboard Marine & Manufacturing Co. v. Gordon* (1949), 403 Ill. 523, 528, 87 N.E.2d 610 (each of the two tests referred to as justifying reversal of agency findings).

■■ Based on *Basketfield*, however, we conclude that the "manifest weight" standard is the applicable standard for judicial review of administrative fact-finding in Illinois.

### B. *Review of the Entire Record*

Section 11 of the Administrative Review Act provides that judicial review "shall extend to all questions of law and of fact presented by the entire record before the court." (Ill. Rev. Stat. 1979, ch. 110, par. 274.) And section 9 specifies that the "entire record" includes all the evidence that was presented to the administrative agency. (Ill. Rev. Stat. 1979, ch. 110, par. 272(b).) This means that "[i]n examining the record, a reviewing court will and must look at all the evidence in opposition to the challenged finding as well as the evidence which tends to support it." *Viera v. Illinois Racing Board* (1978), 65 Ill. App. 3d 94, 100, 382 N.E.2d 462; accord, *Universal Camera Corp. v. NLRB* (1951), 340 U.S. 474, 488, 95 L. Ed. 456, 467-68, 71 S. Ct. 456, 464-65.

We agree that, "It is hard to see how sensible judges could conceivably appraise the substantiality of evidence in a record without looking at the evidence on both sides, for evidence has significance only in a context, not in the abstract." 4 Davis, Administrative Law Treatise sec. 29.03, at 127 (1958).

Moreover, the "entire record of proceedings under review" (Ill. Rev. Stat. 1979, ch. 110, par. 272(b)) clearly includes the findings of fact reached by the agency's hearing officer on the issue of testimonial credibility. (See 4 Davis, Administrative Law Treatise sec. 29.11, at 187 (1958).) "Surely an examiner's report is as much a part of the record as the complaint or the testimony." *Universal Camera Corp. v. NLRB* (1951), 340 U.S. 474, 493, 95 L. Ed. 456, 470, 71 S. Ct. 456, 467.

### C. *Review of Determinations of Testimonial Credibility*

■■ Evidence which, by itself, may be sufficient to support an agency's findings of fact may be insufficient "when the trial examiner has, on the basis of the witnesses' demeanor, made credibility determinations contrary to the Board's position." (*Penasquitos Village, Inc. v. NLRB* (9th Cir. 1977), 565 F.2d 1074, 1078; see also *Kelley v. Murphy* (1967), 20 N.Y.2d 205, 282 N.Y.S.2d 254, 229 N.E.2d 40.) When a hearing officer and an administrative agency reach contrary findings of fact, the hearing officer's findings should be given such deference "as they merit within reason and the light of judicial experience." *Adolph Coors Co. v. FTC* (10th Cir. 1974), 497 F.2d 1178, 1184, *cert. denied* (1975), 419 U.S. 1105, 42 L. Ed. 2d

801, 95 S. Ct. 775; see also *McDonald v. Department of Banking & Finance* (Fla. App. 1977), 346 So.2d 569, 579.

A hearing officer's finding of fact on the issue of testimonial credibility is entitled to a certain degree of deference "for the obvious reason that he or she 'sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records.' " *(Penasquitos Village, Inc. v. NLRB* (9th Cir. 1977), 565 F.2d 1074, 1078; see also *Michigan Employment Relations Com. v. Detroit Symphony Orchestra, Inc.* (1974), 393 Mich. 116, 127, 223 N.W.2d 283, 289.) Therefore, the significance of the hearing officer's findings "depends largely on the importance of credibility in the particular case." *Universal Camera Corp. v. NLRB* (1951), 340 U.S. 474, 496, 95 L. Ed. 456, 472, 71 S. Ct. 456, 469; see also *Townsend v. Nelson* (Minn. 1976), 242 N.W.2d 607, 608-09.*

### D. *The Residuum Rule*

An *obiter dictum* in *Menning v. Department of Registration and Education* (1958), 14 Ill. 2d 553, 558 ("[T]he findings of an administrative agency * * * must rest upon *competent* evidence * * *" (emphasis added)) seems to indicate that Illinois follows the much criticized residuum rule. "The residuum rule requires a reviewing court to set aside an administrative finding unless the finding is supported by evidence which would be admissible in a jury trial." 2 Davis, Administrative Law Treatise sec. 14.10, at 291-92 (1958); see also Professor Davis' well reasoned criticism of the rule at 293-96.

■■ As applied to the facts of the present case, the residuum rule would require that we reverse the Commission's decision because it is based upon the "incompetent" hearsay statements attributed to Marilyn Blye. However, we conclude that the better reasoned rule is that hearsay which is not admissible in a jury trial may be sufficient to support the finding of an administrative agency, if more reliable evidence is not available, "and if in the end the finding is supported by the kind of evidence on which responsible persons are accustomed to rely in serious affairs." *(NLRB v. Remington Rand, Inc.* (2d Cir. 1938), 94 F.2d 862, 873 (per J. Learned Hand), *cert. denied* (1938), 304 U.S. 576, 82 L. Ed. 1540, 85 S. Ct. 1046.) "Hearing officers and agencies have adhered to this commonsense standard instinctively." McCormick, Evidence sec. 351, at 844 (2d ed. 1972).

---

* Because of our resolution of this case, we need not decide whether Starkey was improperly deprived of the right to cross-examine Marilyn Blye, the person whose hearsay accusations formed the basis for the Commission's decision. See, *e.g., Erdman v. Ingraham* (1967), 28 App. Div. 2d 5, 280 N.Y.S.2d 865 (respondent in administrative proceedings was improperly deprived of right to cross-examine his accusers because the agency fact-findings were based on an investigator's testimony about accusations made by persons who were not available for cross-examination).

## II

■■ Despite the fact that the hearing officer found that "Starkey's testimony is credible," the Commission—without having had an opportunity to observe her demeanor as a witness—simply rejected her "defense" as "not credible." We conclude, however, that, in this case, the hearing officer's determination of testimonial credibility is entitled to deference. The charges against Starkey stand or fall based on the question of whether Starkey testified truthfully when she denied the alleged misconduct, or whether Blye's unsworn and un-cross-examined accusations were true. Since testimonial credibility is the crucial factual issue in this case, both logic and judicial experience require that courts give deference to the findings on the issue of testimonial credibility reached by the hearing officer who had an opportunity to evaluate the witnesses in person. The Civil Service Commission's arbitrary action in summarily rejecting Starkey's "defense" as "not credible," after nothing more than its reading of a cold transcript, convinces us that the Commission failed to give Starkey a full and fair hearing. And, we conclude that the Commission's decision is against the manifest weight of the evidence which was presented to the Commission.

Any expertise which the Civil Service Commission has in the field of labor-management relations and any special knowledge which the Commission might have outside the record concerning the operation of the Department of Labor's Waukegan office, do not give the Commission any special ability or expertise in re-evaluating its hearing officer's findings on the issue of testimonial credibility. As a reviewing court, we are acutely aware of the inadequacy of "second guessing" a trier of fact's findings on the issue of testimonial credibility based on a review of a cold transcript. Thus, it is fundamental that a reviewing court should give deference to the trier of fact's decision on the issue of the credibility of witnesses. See, *e.g., People v. Walker* (1978), 58 Ill. App. 3d 535, 538, 374 N.E.2d 880.

Furthermore, as an alternative basis for our decision in this case, we conclude that the inculpatory evidence presented below is not sufficient to support the Commission's decision. The Commission refers to the testimony from the DLE investigators detailing Marilyn Blye's unsworn and un-cross-examined accusations. But, we note that (a) Blye was the target of a criminal investigation at the time these statements were allegedly made; (b) Blye made the accusatory statements while being interviewed at a police station and at the office of a prosecutor; (c) Starkey cooperated with the agents who were investigating Blye; (d) Blye believed that Starkey was responsible for her discharge; and (e) one of the agents initially testified that Blye merely said she *thought* that Starkey admitted being guilty of fraud. We are simply unable to conclude that

reasonable people would rely on this unsupported hearsay evidence in the conduct of serious affairs. Thus, Blye's unsworn and un-cross-examined accusations are not sufficient to support the Commission's decision.

In short we conclude that this vital piece of unsupported inculpatory evidence lacks sufficient probative value, and that the hearing officer's determination that Starkey's exculpatory testimony was truthful is a finding which is entitled to deference. Although we are not permitted to freely substitute our judgment for the one reached by the Civil Service Commission, it is fundamental that, as an appellate court, we are obligated to reverse a decision which is against the manifest weight of the evidence. The decision reached by the Civil Service Commission in this case is patently wrong, and it is, therefore, against the manifest weight of the evidence. Accordingly, the decisions of both the trial court and the Commission are reversed.

Because Starkey prays for reinstatement and the compensation provided for in section 11b of the Personnel Code (Ill. Rev. Stat. 1979, ch. 127, par. 63b111b), we remand this cause to the trial court for further proceedings not inconsistent with this opinion.

Civil Service Commission reversed; circuit court reversed; cause remanded to the circuit court with directions.

MEJDA, J., concurring.

PRESIDING JUSTICE SULLIVAN, dissenting:
I disagree with the decision of the majority.

The majority held the Commission's decision was against the manifest weight of the evidence because of two conclusions—(1) that Blye's testimony inculpating Starkey "lacked sufficient probative value"; and (2) that the Commission did not give proper deference to its hearing officer's conclusions "that Starkey's exculpatory testimony was truthful."

Neither of the majority's conclusions is supported by the record. First, while the majority finds that Blye's testimony was lacking in probative value, the hearing officer found that "the evidence of Marilyn Blye was the most probative gathered in this case" and that "there is no reason to doubt the investigators' recantation of Blye's statement."

Furthermore, tenuous reasons are given by the majority in concluding that Blye's testimony was lacking in probative value. They are (1) Blye was the target of a criminal investigation at the time her statements were made; (2) Blye made the statements while being interviewed at a police station and at the office of an investigator; (3) Blye believed that Starkey was responsible for her discharge; (4) Starkey cooperated with agents who were investigating Blye; and (5) "one of the agents initially testified

that Blye merely said she *thought* that Starkey admitted being guilty of fraud." As to (1), there is nothing to indicate that Blye was the target of a criminal investigation. Investigator McDermott testified that at the time of the first interview with her, he and the other officers "were interested in claims that she may have been involved in which could have been false," and it was at the second interview that she was asked whether other employees were involved in filing false claims; as to (2) the place at which the interviews were had with Blye have no relevance whatsoever; as to (3), the fact that Blye believed Starkey was responsible for her discharge would only go to her credibility and has little significance because it was drawn by the majority from one statement to the investigator that she said Starkey was responsible for the loss of her job and at the same time told him that she was not out to get Starkey, and there is nothing else in the record indicating that Blye may have been resentful or which even remotely suggests that Blye's statements inculpating Starkey were untruthful; as to (4), there is nothing to indicate that Blye knew that Starkey had cooperated with anyone investigating her (Blye); and, as to (5), no agent testified, as stated by the majority, "that Blye merely said she *thought* Starkey admitted being guilty of fraud." The only testimony in this regard was from Investigator McDermott, who stated that during a second interview with Blye—when he asked her whether other employees were involved in filing false claims—she replied as follows: "[T]hat Josie Starkey had filed a false claim for her mother. She said that Josie Starkey brought the claim to her while she was at the computer terminal. She said she thought that Miss Starkey stated that her mother had not been working as listed in the claim." McDermott testified also that:

> "Blye stated that Starky [*sic*] brought the claim to her, and that Blye input it. Blye stated that she knew that Mrs. McCoy was not working as claimed, and Mrs. Starky [*sic*] just merely laughed. Starky [*sic*] repeated to Blye that to file a claim for unemployment compensation, which would be incorrect, a false claim, all that was needed was a social security number, and to put the wages in by affidavit. She also stated that Starky [*sic*] also told her that an address or addresses would be needed to which the employer's notices would be sent. These would be the employer's notices of the last employing unit, and the base period employer. She also stated that it was called an S.U.A. claim. Blye stated that just because the address was incomplete, did not mean that the notices to the employers would not go out. They would go out, but would be returned by the post office as undeliverable if the addresses were incomplete. I believe that was the extent of the conversation with Marilyn Blye at that time."

Investigator Tobias corroborated that testimony of McDermott, and the

testimony of both investigators concerning the statements of Blye were admitted by the hearing officer under the declaration against interest exception to the hearsay rule.

In the light of the above, it appears clear that the reasons given by the majority do not support its conclusion that Marilyn Blye's inculpatory testimony lacked probative value.

The second conclusion given in support of the majority's decision was "that the hearing officer's determination that Starkey's exculpatory testimony was truthful is a finding which is entitled to deference." The record, however, discloses no finding that Starkey was truthful. Rather, after finding that a false claim was clearly entered on behalf of McCoy and that Starkey did not participate in the processing of that claim except to a very small degree, the hearing officer went on to find that Blye's statement "indicated Starkey was actively engaged in the fraudulent scheme"; that Blye "indicated to the investigators that she and Starkey discussed how claims could be submitted fraudulently"; and that Blye indicated that she held Starkey responsible for her (Blye's) losing her job. The hearing officer then concluded that "fortunately for Starkey this [the resentment of Blye towards Starkey] absolves her [Starkey] of all liability." Thus, although the hearing officer found that McCoy's claim was clearly false and that Starkey had participated at least to a small degree, he absolved her of all liability because of a conclusion, reached by pure conjecture, that Blye's inculpatory statements were the result of resentment towards Starkey. Blye, of course, did not testify, and the only reference to possible resentment appears in the testimony of Investigator McDermott that Blye said that she was not friendly with Starkey because she thought Starkey was responsible for the loss of her job, but that she (Blye) never said she would get even with Starkey. This testimony could not support the finding of the hearing officer that Blye's resentment was so strong that it absolved Starkey of all liability.

It was only after this absolution that the hearing officer found that "Starkey's testimony was credible," which is not a finding that her testimony was truthful, as Black's Law Dictionary 330 (5th ed. 1979) defines credible as "[w]orthy of belief; entitled to credit."

Moreover, although concluding that the Commission did not give proper deference to a finding of the hearing officer, the majority gives no deference to the finding of the Commission that Starkey's defense was not credible even though its members are presumed to have broad experience in the field of labor-management relations. (See *Penasquitos Village, Inc. v. NLRB* (9th Cir. 1977), 565 F.2d 1074; *NLRB v. Miller Redwood Co.* (9th Cir. 1969), 407 F.2d 1366.) In this regard, *Miller Redwood* appears to be particularly significant. There, the trial examiner and the Board disagreed upon the employer's motive for discharging an employee. The

court upheld the Board's position, stating "[t]he disagreement related solely to the inferences to be drawn from the whole record and the proper application of the statute. In such a case, 'the presumptively broader gauge and experience of members of the Board have a meaningful role.'" 407 F.2d 1366, 1369.

For a judgment of an administrative agency to be against the manifest weight of the evidence, it must appear that opposite conclusions are clearly evident; it is not enough that an opposite conclusion might be reasonable because, if the issue is merely one of conflicting testimony and credibility of witnesses, the agency's determination should be sustained. (*Keen v. Police Board* (1979), 73 Ill. App. 3d 65, 391 N.E.2d 190; *Walker v. State Board of Elections* (1979), 72 Ill. App. 3d 877, 391 N.E.2d 507.) Furthermore, while the majority cites *Adolph Coors Co. v. FTC* (10th Cir. 1974), 497 F.2d 1178, *cert. denied* (1975), 419 U.S. 1105, 42 L. Ed. 2d 801, 95 S. Ct. 775, for the proposition that where a hearing officer and a commission reach opposite results upon review of the finding of the former, the hearing officer's findings should be "given such weight as they merit within reason and in the light of judicial experience" (497 F.2d 1178, 1184), the majority does not discuss the application of the quoted language to the situation here. We note that it was also held in *Coors* that the findings of the hearing officer "are not sacrosanct and are not necessarily binding on the Commission or the court." 497 F. 2d 1178, 1184.

In any event, in its decision the Commission did not disagree with the finding that Starkey's testimony was credible; rather, it found her defense was not worthy of belief, stating that "taking the record as a whole it is clear that petitioner has proved the charges. We cannot accept the proposition that respondent, an experienced employee, could have by innocent happenstance processed a fraudulent claim for her mother. Respondent's defense is not credible."

The record discloses that a person seeking benefits was required to fill out an application form, to execute an affidavit of wages, and to furnish proof of those wages, which was done here by check stubs;[1] that wage information is then verified by mailing a copy of the affidavit to the employer; that this is accomplished by entering the affidavit of wages into the computer which generates the verification letter sent to the employer; that McCoy testified two forms were presented to her—one being an application which she said was filled out by Starkey and the other a form filled out by a person she did not know—but that she (McCoy) made no entries and did no writing on either form; and that both investigators testified Starkey told them she had prepared the application which was processed on behalf of McCoy, and Starkey made no denial of this

---

[1] The check stubs could not be found and were not introduced at the hearing.

testimony. Starkey testified that she only partially filled out the application of her mother; that she did not (1) place the mark in the dependent child's box—which gave her mother additional benefits, although there was no such child—; (2) place the dash which appears in the place provided for the claimant's signature (the application was not signed); or (3) erase what appears to be her signature—"J. Starkey"—at the bottom of the application. Starkey admitted that she wrote in both the name of H. Holmquist as her mother's employer in 1976 and the date of August 27, 1976, as her mother's last day of employment by the Holmquists. (The application was dated September 13, 1976.) She stated also that the address of the Holmquists was not written in the application by her, although she had also worked for them a few days that year. (The address does not appear on the form, and it should be noted that the failure to provide an address would prevent a certification letter being sent to an employer.) Moreover, Starkey said that she knew her mother should have signed the application and did not know why she had not done so, and that although Starkey testified at the hearing that she personally knew her mother had worked for the Holmquists until August 27, 1976, the date she (Starkey) entered in the application as her mother's last date of employment by the Holmquists, it is clear that her mother did not work for them for at least 6 or 7 years prior to the date of the claim.

Thus, it was established that false wage information and false or nonexistent wage verification concerning McCoy must have been put into the computer, and from Blye's testimony that Starkey was actively engaged in the fraud scheme in that she came to her (Blye) with the application of McCoy and told her (Blye) to put it through the computer. The initials "MB" appearing at the bottom of McCoy's application are apparently those of Marilyn Blye, and the erased signature "J. Starkey" is still discernible on the application. Having this and the other evidence received at the hearing, some of which is set forth above, the experienced members of the Commission found that her defense was not credible. The Commission found, in effect, that her defense of knowing nothing about her mother's false claim except that she filled out a portion of the application was not worthy of belief, and it appears to me that this conclusion is amply supported by the record. In any event, it cannot fairly be said that a decision opposite to that of the Commission is clearly evident.

In the light of the above, it is my belief that there is no record basis for the finding of the majority that the decision of the Commission was against the manifest weight of the evidence, and I would affirm the Commission's decision.