DONNA deOLIVEIRA, Plaintiff-Appellant, v. THE STATE BOARD OF EDUCATION *et al.*, Defendants-Appellees.

Second District No. 2—86—0919

Opinion filed July 13, 1987.

112

Stephen G. Katz, of Kelly, Haus & Katz, of Madison, Wisconsin, for appellant.

Alan T. Sraga, of Scariano, Kula, Ellch & Himes, Chartered, of Chicago, for appellees.

JUSTICE HOPF delivered the opinion of the court:

Plaintiff, Donna deOliveira, seeks review of the decision of the circuit court on administrative review upholding the decision of a hearing officer appointed by the Illinois State Board of Education in a tenured teacher dismissal pursuant to section 24—12 of the School Code (Ill. Rev. Stat. 1983, ch. 122, par. 24—12). As a result of that proceeding, the hearing officer affirmed the dismissal of plaintiff, a speech and language clinician, by defendants, the De Kalb County Special Education Association (DCSEA), and the board of education of De Kalb Community Unit School District No. 428 (board).

The testimony presented at the five-day hearing showed that plaintiff was employed by DCSEA as a speech and language clinician from the 1974-75 school year until her dismissal during the 1984-85 school year. During this period of time she worked as a diagnostician in the birth-to-three program and the three-to-five follow-up program and then as a clinician serving both the Early Childhood and auditorily impaired classes in Sycamore as well as serving half-time classes in the Waterman and Somonauk Early Childhood programs. During the 1976-77 school year Janice Blickhan, a program coordinator with DCSEA, became plaintiff's supervisor. Blickhan remained in this capacity until and including the time of plaintiff's dismissal.

On September 27, 1983, Blickhan sent a letter to plaintiff indicating her dissatisfaction with plaintiff's failure to complete her final speech and language reports at the end of the 1982-83 school year and prior to plaintiff's leaving for the summer, as stated in the job description for speech and language clinicians. In her letter Blickhan noted that she had not been informed by plaintiff that the students' files were missing the speech and language reports and that, as a result, the files had been sent on to kindergarten and special education classes without the reports. Blickhan pointed out that plaintiff's inability to complete required paperwork had been a problem for years and indicated that plaintiff had a problem with her priorities and time usage as well as with her inability to carry out the total job.

On October 31, 1983, Blickhan and William Peters, director of the DCSEA, met with plaintiff to discuss Blickhan's concern with plaintiff's job performance, as expressed in Blickhan's September 27, 1983,

letter. The purpose of the meeting was to discuss plaintiff's performance as a speech and language clinician and to inform her she was being placed on an informal remediation plan.

On November 4, 1983, Blickhan received a letter from Helene Kraus, director of special education for Sycamore Community Unit School District No. 427, wherein Kraus expressed concerns regarding the delivery of speech and language services by plaintiff. Kraus related that the speech and language clinicians employed by School District No. 427 were unaware of what services had been provided by plaintiff while their children attended the DCSEA Early Childhood Program. The records of the children who had received these services contained no speech information regarding tests given, length of the children's therapy, and the short-term or long-term goals and objectives for the students involved.

Blickhan sent a letter to plaintiff, dated November 7, 1983, in which Blickhan indicated that a process of remediation was necessary to address the following concerns:

"1) lack of coordination/organization of delivery of services in Early Childhood classrooms and lack of coordination between you and Early Childhood teachers;

2) lack of follow through regarding specific requests for information from Program Coordinator;

3) lack of completion of reports on students receiving services."

Also on November 7, 1983, Blickhan and Director Peters met with plaintiff to discuss the formulation of a seven-step informal remediation plan. Subsequently, on December 20, 1983, Blickhan and plaintiff met to refine the plan. Among the seven steps, plaintiff was to take the following actions.

"5. Speech/Language Final Reports will be completed prior to end of school. Reports and speech files will be turned into the Program Coordinator two weeks before last day of school. These will be sent to classroom teachers to be added to their files prior to end of school.

6. Short-term objectives will be developed for each child and shared with teachers. These will be marked in each child's Brigance Record Book." (A Brigance Record Book is an assessment tool utilized by the DCSEA for the determination of functional levels of pupils and for determining the goals and objectives for those pupils.)

On April 25, 1984, Blickhan sent plaintiff a memorandum reminding plaintiff that the December 20, 1983, remediation plan, to which

plaintiff agreed and signed, required that the speech and language reports for Early Childhood students be submitted two weeks before the end of the school year, *i.e.*, May 18, 1984. Plaintiff failed to produce the speech and language reports as required.

Plaintiff met with Blickhan and Peters on June 1, 1984, to review plaintiff's progress on the remediation plan. At this time plaintiff had still not produced the final speech and language reports as required in the plan and as requested in Blickhan's April 25, 1984, memorandum. Both Blickhan and Peters testified that plaintiff had made little progress on the remediation plan. The final reports were not submitted by plaintiff during the months of June, July, and August 1984, although plaintiff had indicated at the June 1 meeting that she planned to complete them during the summer.

On July 12, 1984, the DCSEA executive committee, on behalf of the governing board of DCSEA, considered plaintiff's performance as a teacher and adopted a resolution directing the issuance of a letter of remediation to plaintiff. The letter of remediation, or formal notice to remedy, was approved by defendant, the board of education, as the administrative district for DCSEA and issued to plaintiff. In that letter, plaintiff's performance and conduct as a teacher for DCSEA were found to be "incompetent, deficient, insubordinate and unsatisfactory" in the following respects:

"(a) You have failed to meet with all Early Childhood teachers with each week of time spent in each class, as requested.

(b) You have failed to develop written plans regarding the provision of services.

(c) You have failed to complete Speech/Language Final Reports prior to the end of the school year and submit the reports and speech files to the Program Coordinator two weeks before the last day of school as requested.

(d) You have failed to develop short term objectives for every child and share the same with teachers. You have further failed to re-evaluate and update these short term objectives when appropriate.

(e) You have failed to observe the integrated model of speech services offered at School District 428 and 430 Early Childhood sites, as requested.

(f) You have failed to conduct yourself in a professional manner at a multi-disciplinary staff conference."

Based on these deficiencies, the board issued the following remedial actions:

"(a) You shall develop and implement a schedule reflecting

meeting times with Early Childhood teachers per week of time spent in each class and provide the same to your Program Coordinator. Copies of your weekly schedule reflecting the meeting times with teachers shall be provided to your Program Coordinator and the Early Childhood teacher on a weekly basis, prior to the scheduled week.

(b) You shall develop and implement written plans regarding services within classrooms and provide the same on a weekly basis to your Program Coordinator prior to the commencement of the planned week.

(c) Your speech and language reports will be completed on a timely basis and shall be reviewed periodically with your Program Coordinator. Your reports will be provided on a timely basis to classroom teachers and to your Program Coordinator.

(d) You shall develop short-term objectives for each student and re-evaluate the objectives when appropriate. You shall share the objectives developed for each child with the Early Childhood teachers and your Program Coordinator, and the objectives will be marked in the student's Brigance Record Book.

(e) You shall make arrangements to observe the integrated model of speech services offered at School Districts 428 and 430 Early Childhood sites and observe the same no later than September 15, 1984. You shall provide your Program Coordinator with the observation dates at each School District no later than September 1, 1984. After your observations, you shall submit a report of your observations to your Program Supervisor with recommendations as to how the delivery of your services may be improved.

(f) You shall file all records and reports with the Administration on or before the dates set therefor.

(g) You shall conduct yourself in a professional manner at multi-disciplinary staff conferences. Specifically, you shall refrain from compromising the cooperative and nonadversarial atmosphere of staffings and conferences with comments unrelated to your professional opinion regarding the services to be provided."

The letter of remediation clearly set forth that the DCSEA executive committee and the board had determined that the deficiencies, if not remedied by plaintiff, were cause for her dismissal as a teacher in the DCSEA. Plaintiff received the letter of remediation on August 29, 1984.

During the 1984-85 school year, plaintiff was supervised by both

Blickhan and Karen Ryan, the program coordinator for the Early Childhood Program in Sycamore School District 427. On September 4, 1984, Blickhan and Ryan issued a memorandum to plaintiff for the purpose of clarifying plaintiff's responsibilities under the board's letter of remediation. This memorandum requested plaintiff to provide the program coordinators with the following information no later than September 7, 1984: specific information regarding a schedule for the school year, a schedule of meetings with Early Childhood teachers, lesson plans, the Early Childhood speech and language final reports, and short-term objectives for each student. On September 5, 1984, plaintiff met with Ryan to review the memorandum. At that time plaintiff requested an extension of time until the end of September to complete the Brigance testing and to provide the necessary feedback to the staff.

On September 10, 1984, Blickhan and Ryan provided all staff members, including plaintiff, with a memorandum requiring that the fall assessment of students be completed by and recorded in the Brigance Record Books by September 28. Also on September 10, Blickhan and Ryan met with plaintiff and her union representative. At that meeting Blickhan and Ryan provided plaintiff with a written memorandum further clarifying the remediation plan required by the board. On September 19, 1984, Blickhan and Ryan again provided plaintiff with a memorandum clarifying issues discussed at the September 10 meeting. Subsequent to the September 10 meeting, Ryan received a letter, dated September 20, 1984, from the speech/language clinicians from Sycamore School District 427, indicating that as of that date they had not received speech and language folders for six children who had been assigned to plaintiff in the 1983-84 Early Childhood Program. According to testimony provided by Helene Kraus, School District 427 director of special education, this lack of speech and language records from plaintiff during the 1984-85 school year also occurred during the 1983-84 school year.

In a September 24, 1984, memorandum to Blickhan and Ryan, plaintiff informed them that requested lesson plans were available to them at the various school sites, that plaintiff would be unable to complete the end of the year reports or submit the speech and language folders due to a death in the family and personal family situations, and that plaintiff would submit the reports and folders on October 8, 1984.

Subsequently, in an October 1, 1984, memorandum to plaintiff from Blickhan and Ryan, the coordinators indicated that as requested in the board's letter of remediation, Blickhan and Ryan's September 4

memorandum, and the September 5 and September 10 meetings, lesson plans were to be submitted prior to the week implemented and to the coordinators. The memorandum also stated that no lesson plans providing the information requested at the September 10 meeting had been received from plaintiff.

On October 12, 1984, Blickhan and Ryan issued another memorandum to plaintiff regarding her failure to submit, among other items, the speech and language folders and the final speech and language reports by October 8 as previously promised in plaintiff's September 4 memorandum. The purpose of the coordinators' memorandum was to provide plaintiff with feedback regarding her lack of progress on the remediation plan and to remind her that there were numerous outstanding tasks to be completed. Plaintiff was told to complete all tasks immediately. The memorandum specifically informed plaintiff that her attempts to remediate her performance in accordance with the notice to remedy were insufficient and unacceptable and left no alternative other than consideration of further action in accordance with the notice to remedy.

At a meeting of the governing board of DCSEA on October 18, 1984, program coordinators Blickhan and Ryan reported on plaintiff's lack of progress on the remediation plan. Subsequent to this report, the governing board authorized its officers to send a letter to plaintiff expressing their concern for plaintiff's lack of compliance with the notice to remedy. The letter emphasized the seriousness of the situation and informed plaintiff that her failure to remediate the deficiencies in her performance, as set forth in the notice to remedy, constituted "causes, charges, reasons and defects which, if not immediately removed, will result in *** your dismissal as a teacher in the DCSEA."

Following the governing board's meeting, Blickhan and Ryan issued a memorandum on October 19 to plaintiff establishing a meeting date of October 29 to discuss the remediation plan and plaintiff's progress. Plaintiff was requested to bring to the meeting a list of Early Childhood students with short-term objectives completed, all speech and language files on students from the previous school year, any completed speech and language reports, and any completed lesson plans with the format specified at the September 10 meeting. As of the date of the October 19 memorandum, plaintiff had made no progress, even after Blickhan and Ryan's October 12, 1984, memorandum to her.

On October 29, plaintiff met with Blickhan and Ryan to discuss her progress on the remediation plan and to determine if there were ways that Blickhan and Ryan could assist her. Prior to the meeting,

Blickhan and Ryan had reviewed the Brigance Record Books, finding that only about 22% of the speech and language areas had been evaluated. Plaintiff reported that she had made only minimal progress in the other areas of the remediation plan. When plaintiff's request for time off to complete the tasks listed on the plan was denied, plaintiff then asked if she could be granted temporary disability for two to four weeks. Blickhan and Ryan informed plaintiff that this request would have to be discussed with DCSEA Director Peters. Plaintiff was also told that the DCSEA governing board had determined if plaintiff had not made significant progress towards the goals on the remediation plan by November 15, 1984, a letter of dismissal would be issued.

On October 30, 1984, plaintiff informed Ryan by telephone that it was necessary for her to take two personal days of paid leave on October 31 and November 1 and one day of unpaid leave on November 2 to go to Las Vegas with her husband, who was considering an employment position in that city. Plaintiff testified that while in Las Vegas, she investigated schools and housing.

On Monday, November 5, 1984, after working a normal workday, plaintiff met with Blickhan and informed Blickhan that she could not continue, was having great difficulty functioning, and needed time off. Plaintiff took sick leave on November 6 and 7, 1984. On November 7, plaintiff met briefly with Blickhan, bringing a note addressed to Director Peters, along with a note from her family physician, Dr. Robert Purdy, which read as follows:

"11-6-84

To Whom It May Concern:

Donna de Oliveira is under active medical treatment. Please give her 'leave of absence' until further notice."

Plaintiff indicated that she was on medication and needed time off. She also requested a meeting with Blickhan on November 13 to submit some of the items requested in the remediation plan.

DCSEA Director William Peters telephoned plaintiff on November 8 requesting more information regarding the treatment she was receiving from Dr. Purdy, including the nature of her condition and the specific length of time she would be off work. Plaintiff agreed to discuss Peters' request with Dr. Purdy and to try to obtain the requested information before the upcoming DCSEA governing board's meeting on November 15. Peters' testimony indicated that he did not consider Dr. Purdy's note to constitute medical confirmation that plaintiff was being treated for an emotional problem as she alleged.

At plaintiff's request, Blickhan and Ryan met with her on Novem-

ber 14, 1984. At that time, plaintiff had been on sick leave since November 6. Plaintiff submitted two memoranda to Blickhan and Ryan, dated November 8 and November 11, which proved to be inadequate. Plaintiff indicated that she had no reports or speech and language folders to submit nor had she recorded any further testing information in the Brigance Record Books since their last meeting on October 29. Plaintiff failed to present any further information from Dr. Purdy as requested by Peters but informed Blickhan and Ryan that Peters could call Dr. Purdy if he had any questions. Plaintiff also discussed the family's impending move to Las Vegas.

On November 15, 1984, Blickhan and Ryan and DCSEA Director Peters met with the executive committee of the DCSEA and discussed plaintiff's lack of progress on the remediation plan. The executive committee adopted a resolution authorizing a "Notice of Charges and Dismissal" of plaintiff as a teacher in the DCSEA. On November 16 Peters telephoned plaintiff, informing her of the executive committee's November 15 action and telling her that the executive committee had determined to consider her use of sick leave after November 7 a nonissue, regardless of the fact that she had failed to submit additional information from her physician as requested by Peters.

On the afternoon of November 19 plaintiff submitted a letter of resignation to Peters indicating an effective date of January 21, the end of the first semester of the 1984-85 school year. Plaintiff testified that such a resignation date would have given her adequate time to return to work and provide for an orderly transition so that DCSEA could hire another speech and language clinician. Peters testified that plaintiff's resignation date roughly coincided with her accumulated sick leave and that he did not recall her making any statement that she was intending on returning to work for any reason. Peters told plaintiff that he could not recommend the acceptance of the resignation and that he would recommend her suspension without pay pending a dismissal hearing.

On the evening of November 19, 1984, the board of education of De Kalb Community Unit School District No. 428, as the administrative district, met and considered the DCSEA executive committee's November 15 action, and, upon the recommendation of Director Peters that plaintiff's resignation be rejected and the notice of dismissal issued, approved the executive committee's resolution to issue the notice of dismissal. On January 17, 1985, the executive committee and the board issued a bill of particulars to plaintiff, specifying the reasons and causes for her dismissal, along with attachments.

Pursuant to section 24—12 of the School Code (Ill. Rev. Stat.

1983, ch. 122, par. 24—12), a hearing was held before hearing officer Stuart Anderson on April 24 and 25 and June 11, 12, and 13, 1985. On October 4, 1985, in a lengthy and detailed decision which included a chronology of the events leading to plaintiff's dismissal, the hearing officer's highlights and observations of the testimony presented, a discussion of the plaintiff's defense of temporary mental incapacity, and the decision, the hearing officer upheld plaintiff's dismissal by the DCSEA and the board.

On November 6, 1985, plaintiff filed her complaint for administrative review with the circuit court. After reviewing the record of the hearing and the briefs of the parties and hearing oral arguments by counsel for plaintiff and defendants, the court issued a letter opinion and subsequent order affirming the hearing officer's decision. This appeal ensued.

In this court plaintiff contends: (1) that the manifest weight of the evidence established that plaintiff was suffering from a temporary mental incapacity during her remediation period, and therefore the length of her remediation period was not reasonable as required under the tenure law; (2) that plaintiff's failure to complete the tasks required under the notice to remedy was not caused by insubordination but rather resulted from her incapacity; (3) that the trial court erred in failing to reverse the decision of the hearing officer, as that decision was based on plaintiff's conduct prior to her receipt of the notice to remedy; and (4) that the circuit court erred in requiring plaintiff to establish her mental incapacity during the remediation period by the manifest weight of the evidence.

▮▮ ▮ The method of dismissing or removing tenured teachers from their positions is expressly regulated by statute and must be substantially followed if a dismissal is to be valid and effective. (*People ex rel. Head v. Board of Education* (1981), 95 Ill. App. 3d 78, 81, 419 N.E.2d 505.) Under the section of the School Code in effect at the time of plaintiff's dismissal, a teacher could be dismissed for incompetency, cruelty, negligence, immorality or other sufficient cause. (Ill. Rev. Stat. 1983, ch. 122, par. 10—22.4.) A teacher could also be dismissed whenever, in the school board's opinion, the teacher was not qualified to teach or whenever the interests of the school required it. (Ill. Rev. Stat. 1983, ch. 122, par. 10—22.4.) An adjunct of the power to dismiss a tenured teacher is the board of education's corresponding duty to make the initial determination of whether a cause is remedial or grounds for dismissal. (*Paprocki v. Board of Education* (1975), 31 Ill. App. 3d 112, 114, 334 N.E.2d 841.) Where remedial causes " 'continue for a long enough period of time and where the teacher refuses

or fails to remedy them, they may be considered irremediable' " and grounds for discharge. (*Combs v. Board of Education* (1986), 147 Ill. App. 3d 1092, 1103, 498 N.E.2d 806, citing *Szabo v. Board of Education* (1983), 117 Ill. App. 3d 869, 873, 454 N.E.2d 39.) However, a teacher's temporary mental incapacity to perform teaching duties does not constitute a cause for discharge. Ill. Rev. Stat. 1983, ch. 122, par. 10—22.4.

In the instant case, a letter of remediation was issued to plaintiff by the executive committee of the DCSEA and the board, as administrative district, on August 21, 1984, nearly one year after plaintiff had been placed on an informal remediation plan, upon which she had made little progress. During plaintiff's formal remediation period of nearly 2½ months, plaintiff's supervisors, Janice Blickhan and Karen Ryan, kept in constant contact with plaintiff, clarifying the remediation plan, establishing deadlines, and offering their assistance. Plaintiff, however, continued to fail to meet the deadlines or to accomplish the tasks on the plan.

Plaintiff first contends that she was incapable of remediating during the formal remediation period, as she was suffering from a temporary mental incapacity due to depression. Therefore, she was not given a reasonable period of time to perform under the notice to remedy prior to the DCSEA executive committee and the board's review of her remediation efforts and their subsequent dismissal decision. Given the facts of this case, however, plaintiff's remediation period could not be considered of an insufficient duration, unless plaintiff proved she was suffering from a temporary disability. Defendants maintain that plaintiff did not meet her burden of proof to establish her temporary mental incapacity and to show that she was dismissed because of that incapacity. We are in agreement with the defendants' position.

At the time of plaintiff's dismissal the defendants had no substantial reason to believe that she had been suffering from any temporary mental incapacity during her period of remediation. The first possible indication to plaintiff's supervisors of any alleged incapacity occurred on November 5, 1984, when plaintiff met with Blickhan and told her she could not go on, was having great difficulty functioning, and needed time off. Curiously, this request for a leave of absence occurred only after plaintiff had been denied, at the October 29, 1984, meeting with her supervisors, her request to be pulled out of the classroom to work on completing the tasks listed on the remediation plan.

Plaintiff implies that her depressive state should have been appar-

ent to Blickhan, who in 1981, as plaintiff's supervisor, had advised plaintiff to take some time off from her school duties due to emotional fatigue. Conversely, we believe this implication supports defendants' position that plaintiff was not suffering from depression. Having acted as plaintiff's supervisor for seven years, Blickhan was very familiar with plaintiff's behavior and conduct and testified that she observed no behavior emanating from plaintiff during the remediation period which differed from that which she had observed in the years prior to the remediation period. Moreover, Blickhan testified that she was familiar with depression, as a close relation of hers suffered from it. We conclude that had plaintiff's alleged depressive state been present during her remediation period, Blickhan, who was well acquainted with plaintiff's deportment and who was continually communicating with plaintiff during the remediation period, would have certainly noted this change in plaintiff's behavior.

The fact that plaintiff was allegedly experiencing a serious medical problem was not brought to the attention of her supervisors until November 7, 1984, when plaintiff presented Blickhan with the following note from her family physician, Dr. Robert Purdy:

"11-6-84

To Whom It May Concern:

Donna de Oliveira is under active medical treatment. Please give her 'leave of absence' until further notice."

At the time plaintiff presented this note to Blickhan, plaintiff contended that she was on medication and needed time off. However, she also indicated that she wished to meet with Blickhan the following week to submit some of the items requested in the remediation plan. We believe it is of significance that plaintiff's presentation of the note from Purdy occurred shortly after she had been denied her October 29 request to be relieved of her classroom duties to work on the remediation plan and after she had been warned that dismissal at the November 15 meeting was imminent unless plaintiff made significant progress towards the goals on the plan.

■ Blickhan forwarded Purdy's note to Director Peters, who telephoned plaintiff on November 7, requesting more information regarding the nature of plaintiff's purported illness, the length of her expected absence, and the nature of the treatment she was supposedly receiving from Purdy. Plaintiff agreed to discuss Peters' request with Purdy and attempt to obtain the requested information before the DCSEA governing board's November 15 meeting, but the requested information was never provided prior to plaintiff's dismissal. Section 10—22.4 of the School Code states that temporary or physical inca-

pacity to perform teaching duties, *as found by a medical examination*, is not a cause for dismissal. (Ill. Rev. Stat. 1983, ch. 122, par. 10—22.4.) However, defendants contend that the note from Dr. Purdy did not comply with section 10—22.4 as it contained nothing of a substantive nature to evidence a medical examination which conclusively established plaintiff's temporary mental incapacity to perform her teaching duties. We agree and find that the note was insufficient to inform the defendants of plaintiff's alleged temporary mental incapacity.

■ Plaintiff argues that both the hearing officer and the trial court, in reaching their decisions, ignored Dr. Purdy's testimony regarding the plaintiff's temporary incapacity. Defendants devote considerable space to arguing that Dr. Purdy, a *general practitioner*, was not legally competent to testify about plaintiff's supposed mental illness. We note only that while the hearing officer reached no specific finding regarding Purdy's competency to testify, the hearing officer did determine that Purdy had no specific training in psychiatry and exhibited an apparent lack of familiarity with psychiatric terminology. These findings, as the circuit court pointed out in its letter opinion, go merely to the weight of Purdy's testimony. A hearing officer's findings of fact regarding testimonial credibility are entitled to a certain degree of deference since he sees the witnesses and hears them testify, while the reviewing court looks only at cold records. (*Starkey v. Illinois Civil Service Com.* (1982), 105 Ill. App. 3d 904, 910, 435 N.E.2d 176.) From our review of the "cold" record and the hearing officer's aforementioned findings regarding Purdy's testimony, we conclude, despite plaintiff's contention to the contrary, that the hearing officer in reaching his decision gave the proper consideration to the physician's testimony.

■ Defendants point out that plaintiff's conduct while "incapacitated" also undermined her defense that her temporary mental incapacity prevented her performance of the tasks set forth in the remediation plan. During the time that plaintiff claimed that she was incapable of coping with the tasks required in the remediation plan, she was able to carry out personal obligations that arose in connection with family illnesses, assist her husband in opening a professional practice, and travel to Las Vegas to investigate schools and housing in anticipation of a family move. Also, despite her contention that she was unable to work, she continued to apply herself to the remediation plan and to search for other employment. We are in agreement with defendants that plaintiff's activities belied her alleged temporary mental incapacity.

We conclude that the manifest weight of the evidence did not establish that plaintiff suffered from a temporary mental incapacity during her remediation period and that, therefore, plaintiff had sufficient time in which to perform under the notice to remedy.

■ Next, we consider plaintiff's contention that her failure to complete the tasks required under the notice to remedy was not caused by insubordination but rather resulted from her temporary mental incapacity. Plaintiff maintains that insubordination results when one consciously decides not to do work one has been expressly or impliedly directed to do. Therefore, plaintiff argues, she cannot be guilty of insubordination since her failure to complete the work she was directed to do in the notice to remedy was not the result of her conscious will but the product of her illness. Plaintiff also contends that insubordination was the only charge made against her by defendants.

In an employer-employee relationship insubordination "imports a willful disregard of express or implied directions of the employer and refusal to obey reasonable orders." (Black's Law Dictionary 942 (4th ed. 1968).) "Willful" denotes "done deliberately: not accidental or without purpose." (Webster's Third New International Dictionary 2617 (1981).) Clearly, the evidence shows that plaintiff's failure to complete the tasks on the remediation plan constituted a deliberate disregard of the express directions of the DCSEA and the board of education in their notice to remedy. Time after time these directions, or orders, were clarified for plaintiff, and deadlines were established for completing the tasks, or even a mere portion of a task. For the most part, these deadlines were ignored even when plaintiff herself was allowed to choose the deadline date. Tasks which plaintiff did attempt to accomplish were considered inadequate, especially in light of the fact that specific procedural guidelines established for assisting the plaintiff in accomplishing the tasks were not followed. Rather, plaintiff did the tasks in the manner in which she wanted to do them.

Throughout the remediation period, plaintiff was warned, both verbally and in writing, that her continual inaction, or disobedience, could result in her dismissal. Yet, plaintiff continued to refuse to comply with even the simplest order, such as to submit her speech and language folders "as is."

Despite the fact that such conduct, in our opinion, illustrates plaintiff was guilty of insubordination, plaintiff argues that it was her depression that prevented her from performing the tasks required of her on the remediation plan. Plaintiff's argument fails to recognize that the duties plaintiff was ordered to perform under the plan were

identical to those duties she had failed to discharge throughout the 1983-84 school year and prior to the beginning of her alleged depression. It is unlikely that this alleged depression resulted in her poor performance. As the hearing officer found, if plaintiff did suffer from depression, the illness apparently had little or no effect on her job performance, since her performance prior to the onset of depression was similar.

A hearing officer's findings on factual questions are *prima facie* true and correct and will not be disturbed on review unless they are contrary to the manifest weight of the evidence. (*Burke v. Board of Review* (1985), 132 Ill. App. 3d 1094, 1100, 477 N.E.2d 1351; Ill. Rev. Stat. 1985, ch. 110, par. 3—110.) Our review of the record indicates that the hearing officer's foregoing finding, that plaintiff's lack of performance did not result from depression, was not against the manifest weight of the evidence. Therefore, plaintiff's argument that her dismal performance was due to her depressed state rather than insubordination is without merit.

■ We question the validity of plaintiff's contention that insubordination was the only charge "marshalled" against her, as both the letter of remediation and the notice of dismissal charged plaintiff with incompetent, negligent, and deficient, as well as insubordinate, conduct. Moreover, it is apparent from the 16 findings listed in the hearing officer's "Highlights and Observations of the Testimony," many of which related to plaintiff's incompetent, negligent, or deficient conduct, that plaintiff's dismissal was not based solely on insubordination. Also, the circuit court found that plaintiff failed to establish that the hearing officer's findings of deficient and neglectful performance, as well as insubordination, were against the manifest weight of the evidence.

It is obvious to us, as apparently it was to the hearing officer and the circuit court, that plaintiff's failure to communicate with other staff and her superiors, her failure to document and record in her students' final speech and language reports the goals and objectives, testing, and progress of those students for the benefit of subsequent speech and language clinicians, her failure to develop and share short-term objectives with staff and to utilize the Brigance Record Books so that her students' classroom teachers could integrate and implement speech and language services in their classrooms, and her failure to keep scheduled meetings with teachers to share or evaluate objectives were evidence of plaintiff's incompetent, negligent, and deficient conduct. We conclude that the evidence was sufficient to support the hearing officer's findings that plaintiff's dismissal resulted from her

insubordinate, deficient, and neglectful performance of her duties and not from her incapacity.

 █ Plaintiff's next contention is that the trial court erred in failing to reverse the decision of the hearing officer, as that decision was based on plaintiff's conduct prior to her receipt of the notice to remedy. Plaintiff relies on one statement from the hearing officer's decision to argue that the hearing officer erred in considering plaintiff's 1983-84 conduct in reaching his decision that sufficient cause existed for her dismissal. That statement read as follows:

> "Although deOliveira claimed that her illness commenced on June 1, 1984, her failure to discharge her duties existed throughout the 1983-84 school year."

A formal remediation period is only initiated by official school board action and unofficial notices (plans) given by school administrators are not controlling. (*Board of Education v. State Board of Education* (1980), 82 Ill. App. 3d 820, 825, 403 N.E.2d 277.) We agree that plaintiff's conduct during the 1983-84 school term was subject only to the informal remediation plan of December 1983 developed by Blickhan, Peters, and plaintiff. However, we do not read the foregoing statement by the hearing officer as indicating that he considered plaintiff's conduct during the informal remediation period in reaching his decision. The sentence which immediately follows the aforementioned statement states: "If she did suffer from depression, it apparently had little or no effect on her job performance." When the two sentences are read together, it seems reasonable to conclude, as the defendants propose, that the hearing officer considered plaintiff's prenotice conduct strictly for the purpose of determining whether plaintiff's purported depression bore any relationship to her failure to complete her assigned tasks during the formal remediation period. We do not consider this an impermissible purpose.

Moreover, as defendants contend, plaintiff's use of her prenotice to remedy conduct for the purpose, as set forth in her circuit court brief, of substantiating her own position that her past history in completing assigned tasks was valuable in showing how insignificant DCSEA considered those tasks undermines any argument she makes here regarding the impermissibility of consideration of such prior conduct.

 Last, plaintiff argues that the trial court erred in requiring plaintiff to establish her temporary mental incapacity during the final days of the remediation period by the manifest weight of the evidence rather than by the proper standard applicable to tenured-teacher dismissal proceedings, *i.e.*, the preponderance of the evidence. (*Board of*

*Education v. State Board of Education* (1986), 113 Ill. 2d 173, 189, 497 N.E.2d 984.) In support of this contention, plaintiff relies on the following statement from the trial court's letter opinion:

"Donna deOliveira, has not met the burden of proof required, that is by the manifest weight of the evidence, that she was under a temporary mental incapacity during the final days of the remediation period so as to prevent her from substantial performance of the tasks required by the De Kalb County Special Education Association."

We, however, read this statement as referring only to plaintiff's failure to meet her burden on administrative review of proving the primary allegation raised in her complaint, that is, that the hearing officer's findings and conclusions were against the manifest weight of the evidence.

Nevertheless, plaintiff's contention ignores the fact that if the court misapplied the manifest weight of the evidence standard to the temporary mental incapacity issue, any error was corrected in the court's subsequent written final order. In that order the court found:

"3. Plaintiff Donna deOliveira has failed to establish that she suffered from a temporary mental incapacity during the final days of the remediation period so as to prevent her from substantial performance of the tasks required by the De Kalb County Special Education Association and that the hearing officer's decision on said issue was against the manifest weight of the evidence."

We believe this finding clarifies any alleged error set forth in the court's letter opinion and illustrates that the court did apply the proper standard in reviewing the hearing officer's decision. (See *McGowen v. City of Bloomington* (1981), 99 Ill. App. 3d 986, 989, 426 N.E.2d 328.) Even if, however, the trial court erred in applying the wrong standard of proof, its decision was correct since under the evidence before it, the result would be the same regardless of the standard applied.

For all of the foregoing reasons, we are in accord with the judgment of the circuit court of De Kalb County affirming the hearing officer's decision to uphold plaintiff's dismissal as a teacher in the special education programs operated by DCSEA.

Affirmed.

NASH and WOODWARD, JJ., concur.